760 P.2d 161

**TENNECO OIL COMPANY,**
Petitioner–Appellant,

v.

**NEW MEXICO WATER QUALITY CONTROL COMMISSION,**
Respondent–Appellee,

**NAVAJO REFINING COMPANY,**
Petitioner–Appellant,

v.

**NEW MEXICO WATER QUALITY CONTROL COMMISSION,**
Respondent–Appellee.

Nos. 9103, 9106.

Court of Appeals of New Mexico.

Dec. 22, 1987.

Certiorari Denied Jan. 29, 1988.

Karen Aubrey, Kellahin & Kellahin, Santa Fe, for petitioner-appellant Tenneco Oil Co.

Bruce S. Garber, Santa Fe, for petitioner-appellant Navajo Refining Co.

Hal Stratton, Atty. Gen., Andrea L. Smith, Asst. Atty. Gen., Duff Westbrook, Sp. Asst. Atty. Gen., Santa Fe, for respondent-appellee.

## OPINION

FRUMAN, Judge.

Tenneco Oil Company and Navajo Refining Company appeal from the New Mexico Water Quality Control Commission's adoption of regulations establishing numerical standards for fourteen organic compounds[1] in groundwater. The issues raised in this consolidated appeal are: (1) what standard of review should this court apply; (2) whether the Commission's decision was arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law; and (3) whether the decision was based on substantial evidence. We affirm.

## I. BACKGROUND

Prior to the adoption of the regulations, the Commission received testimony and evidence at its public hearing on September 4–6, 1985. Then, at its public meeting on December 10–11, 1985, the Commission considered the evidence presented at the earlier hearing, voted to adopt the regulations, and asked its counsel to compile a statement of reasons based on the discussions during that meeting. This compilation was adopted at a public meeting on January 14, 1986. The regulations establishing the numerical standards were filed two weeks later.

## II. STANDARD OF REVIEW

The Water Quality Act, NMSA 1978, Sections 74–6–1 to –13 (Repl.1986) specifically provides for judicial review of

---

1. These organic compounds are: vinyl chloride, 1–1–dichloroethane, 1–2–dichloroethane, 1–2–dibromoethane, 1–1–1–trichloroethane, 1–1–2–trichloroethane, 1–1–2–2–tetrachloroethane, me-thylene chloride, chloroform, toluene, ethyl benzene, xylenes, napthalenes and monomethylnapthalene compounds, and benzo-a-pyrene.

regulations adopted by the Commission. Section 74–6–7(A) states that "appeals shall be upon *the record made at the hearing,*" and subsection (C) requires a regulation to be set aside if it is: "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by *substantial evidence in the record* * * * or (3) otherwise not in accordance with law." (Emphasis added.)

While the parties agree that Section 74–6–7(A) and (C) sets forth the standard of review applicable to this appeal, they disagree as to what constitutes the record for review. Navajo argues that based on the Open Meetings Act, NMSA 1978, Sections 10–15–1 to –4 (Repl.Pamp.1987), only the transcript and minutes of the Commission's December public meeting comprise the record, since a public body may deliberate and vote only at a public meeting. § 10–15–1. The Commission contends that Section 74–6–7 mandates that our review include the record of the two public meetings and the public hearing and cites to *Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.,* 101 N.M. 291, 681 P.2d 717 (1984), for support. Tenneco also relies on *Duke City Lumber Co.* when it claims that the substantial evidence rule requires that we examine the entire administrative record. We agree with Tenneco and hold that our review must encompass the record of the three Commission sessions.

In *Duke City Lumber Co.,* the standard of review in the Air Quality Control Act, NMSA 1978, Sections 74–2–1 to –17 (Repl. Pamp.1983), was considered in an appeal from the denial of a variance. The court construed the judicial review provisions and decided to:

> expressly modify the substantial evidence rule * * * and supplement it with the whole record standard for judicial review of findings of fact made by administrative agencies. A review of the whole record is clearly indicated in those cases where the administrative agency serves not only as the factfinder but also as the complainant and prosecutor.

101 N.M. at 294, 681 P.2d at 720.

Although *Duke City Lumber Co.* involved adjudication rather than rule-making, Section 74–2–9 of the Air Quality Control Act is similar to Section 74–6–7 of the Water Quality Act in providing that: "appeals shall be upon *the record made at the hearing* " and the court of appeals shall set aside the denial of a variance "not supported *by substantial evidence in the record.*" (Emphasis added.) We therefore find that *Duke City Lumber Co.'s* express application of the whole record standard of judicial review to findings of fact made by administrative agencies in general controls where the Commission acts in its rule-making capacity.

### III. COMPLIANCE OF THE RULE-MAKING PROCEDURE WITH THE LAW

Appellants maintain that the Commission's decision in setting numerical standards should be set aside, pursuant to Section 74–6–7(C), because it was arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law. Appellants allege that the Commission's rule-making failed to meet various procedural and statutory requirements. Each allegation will be considered separately.

#### A. *Consideration of six criteria mandated by statute.*

Appellants claim that the record does not contain evidence of the Commission's consideration of factors two through six, found in Section 74–6–4(D) of the Water Quality Act; thus, the Commission's decision was arbitrary, capricious, and not in accordance with law. The Commission responds that it did consider all factors and gave them the weight it deemed appropriate. The Commission acknowledges that, as proponent of the regulations, it has the initial burden of proof in establishing that it did consider all six factors. *Cf. International Minerals & Chem. Corp. v. New Mexico Public Serv. Comm'n,* 81 N.M. 280, 466 P.2d 557 (1970) (holding that the common-law rule that the moving party has the burden of proof applies to administrative agencies).

In delineating the Commission's duties and powers, Section 74–6–4(D) requires that it:

> shall adopt * * * regulations to prevent or abate water pollution in the state * * *. Regulations shall not specify the method to be used to prevent or abate water pollution, but may specify a standard of performance for new sources which reflects the greatest degree of effluent reduction which the commission determines to be achievable through application of the best available demonstrated control technology * * * including where practicable, a standard permitting no discharge of pollutants. In making its regulations, the commission shall give weight it deems appropriate to all facts and circumstances, including but not limited to:
>
> (1) character and degree of injury to or interference with health, welfare and property;
>
> (2) the public interest, including social and economic value of the sources of water contaminants;
>
> (3) technical practicability and economic reasonableness of reducing or eliminating water contaminants from the sources involved and previous experience with equipment and methods available to control the water contaminants involved;
>
> (4) successive uses, including but not limited to, domestic, commercial, industrial, pastoral, agricultural, wildlife and recreational uses;
>
> (5) feasibility of a user or a subsequent user treating the water before a subsequent use; and
>
> (6) property rights and accustomed uses * * *.

■ The record contains considerable evidence for all fourteen organic compounds on factor one, injury to health and welfare. The Commission interpreted factor two to mean principally the public health interest, and there is evidence that this interest is better served by preventing groundwater contamination, rather than by costlier remedial action or mitigation. Regarding factor three, an Environmental Improvement Division witness testified as to the availability and cost of treatment technologies for remedial actions in cleaning groundwater contaminated by the two general chemical categories to which the fourteen compounds belong.[2] The witness explained the significance for treatment technologies of grouping classes of compounds by their physical and chemical properties, and testified that the cost of contamination prevention was less than the cost of mitigation. Evidence was also presented on the availability of treatment technologies for the prevention of contamination by the subject compounds. For one prevention technology—pond lining—the record includes examples of its installation by several New Mexico companies and its cost. Factor four, successive use, was considered in the context of protection for the highest standard of groundwater use, that is, a drinking-water standard. Also made part of the record is a Commission report that ninety percent of the water used by three-fourths of the state's population is supplied by public systems having groundwater sources. As to factor five, feasibility of treatment before a subsequent use, an EID witness testified that, depending upon the particular process, a municipal water treatment system may not be adequate to remove the subject contaminants from groundwater. On factor six, there is evidence relating to in-state property damage caused by contamination by the general classes of subject compounds, such as damage to a municipal public water well. Having reviewed the record, we conclude that the Commission made a prima facie showing that it did consider the six criteria listed in Section 74–6–4(D).

Appellants further contend that Section 74–6–4(D) requires the record to contain the Commission's consideration of every part within the six factors for each organic compound, and because that consideration is absent, the regulations should be set aside as arbitrary and capricious.

---

**2.** The two general chemical categories to which the subject compounds belong are volatile organic compounds and polynuclear aromatic hydrocarbons.

In construing statutes, the reviewing court must give effect to the intention of the legislature. *Atencio v. Board of Educ.*, 99 N.M. 168, 655 P.2d 1012 (1982). The plain language of a statute is the primary indicator of that intent. *General Motors Acceptance Corp. v. Anaya*, 103 N.M. 72, 703 P.2d 169 (1985). Although the reviewing court will not read into a statute language that is not there, it will read an act in its entirety and construe each part in order to produce a harmonious whole. *See Westgate Families v. County Clerk*, 100 N.M. 146, 667 P.2d 453 (1983).

■ Section 74–6–4 requires that water quality standards be adopted as a guide to water pollution control and that regulations be promulgated to prevent or abate water pollution. Subsection (D) directs the Commission, in making its regulations, to *"give weight it deems appropriate* to all facts and circumstances," including the six factors, and it *"may specify a standard* of performance for new sources which reflects the greatest degree of effluent reduction *which [it] determines to be achievable* * * * including where practicable * * * no discharge of pollutants."* (Emphasis added.) That subsection does not indicate how the six factors are to be considered. We read the emphasized language as providing the Commission with reasonable discretion in its consideration of the six factors and in the weight it gives to each factor.

An agency's rule-making function involves the exercise of discretion, and a reviewing court will not substitute its judgment for that of the agency on that issue where there is no showing of an abuse of that discretion. *See Apex Oil Co. v. Federal Energy Admin.*, 443 F.Supp. 647 (D.D. C.1977); *Bayonet Point Hosp., Inc. v. Department of Health & Rehabilitative Servs.*, 490 So.2d 1318 (Fla.App.1986). *Cf. Conwell v. City of Albuquerque*, 97 N.M. 136, 637 P.2d 567 (1981) (holding that in reviewing an adjudicative proceeding, the reviewing court generally may not substitute its judgment for that of the administrative decision maker). Rules and regulations enacted by an agency are presumed valid and will be upheld if reasonably consistent with the statutes that they implement. *Hi–Starr, Inc. v. Washington State Liquor Control Bd.*, 106 Wash.2d 455, 722 P.2d 808 (1986).

■ A party challenging a rule adopted by an administrative agency has the burden of showing the invalidity of the rule or regulation. *See Agrico Chem. Co. v. State Dep't of Envtl. Regulation*, 365 So.2d 759 (Fla.App.1978). The reasonableness of an administrative rule or regulation is not purely a legal question; a factual basis must appear. *Pan Am. Petroleum Corp. v. Federal Power Comm'n*, 352 F.2d 241 (10th Cir.1965). To successfully challenge a rule promulgated by an agency exercising its delegated legislative authority, the challenger must show, in part, that the rule's requirements are not reasonably related to the legislative purpose but are arbitrary and capricious. *See State, Marine Fisheries Comm'n v. Organized Fishermen of Florida*, 503 So.2d 935 (Fla.App. 1987). *Cf. Conwell v. City of Albuquerque* (holding that judicial review of an administrative adjudication is limited to determining whether the agency acted fraudulently, arbitrarily or capriciously, whether its order was supported by substantial evidence, and whether its action was within the scope of its authority). " 'Arbitrary and capricious action has been defined as willful and unreasoning action, without consideration and in disregard of facts and circumstances * * *. Where there is room for two opinions, [the] action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached.' " *Hi–Starr, Inc.*, 106 Wash.2d at 464, 722 P.2d at 814 (quoting *State v. Rowe*, 93 Wash.2d 277, 284, 609 P.2d 1348, 1351 (1980)). *See also Garcia v. New Mexico Human Servs. Dep't*, 94 N.M. 178, 608 P.2d 154 (Ct.App.1979), *rev'd on other grounds*, 94 N.M. 175, 608 P.2d 151 (1980).

Our review of the record indicates that the Commission reasonably exercised its discretion in weighing the facts and circumstances and acted in accord with the mandate of Section 74–6–4(D) in its consideration of the six factors.

### B. Statement of reasons.

Appellants claim that the Commission's statement of reasons for adopting the numerical standards was a *post hoc* rationalization, and, therefore, the regulations should be set aside. They allege that the statement of reasons was invalid because it was compiled *after* the Commission voted to adopt the numerical standards and because it contained assertions that had not been articulated by the Commission.

■ There is no statutory requirement that the Commission make formal findings in its rule-making process. In *City of Roswell v. New Mexico Water Quality Control Comm'n*, 84 N.M. 561, 505 P.2d 1237 (Ct.App.1972), we held that although the record must indicate the Commission's reasoning and basis for adopting regulations, formal findings are not required. *See also Bokum Resources Corp. v. New Mexico Water Quality Control Comm'n*, 93 N.M. 546, 603 P.2d 285 (1979).

*Post hoc* rationalizations are defined as "explanations of counsel for administrative decisions not employed by the agency and subsequent to the occurrence of the administrative action being reviewed." *Smith v. F.T.C.*, 403 F.Supp. 1000, 1009 (D.Del.1975). The courts are not free to accept such *post hoc* rationalizations, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962), since "in dealing with a determination or judgment which an ... agency alone is authorized to make, [a reviewing court] must judge the propriety of such action solely by the grounds invoked by the agency." *Securities & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

However, in *Independent U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 920 (D.C.Cir.1982), it was observed that statements of purpose do have a value:

> The preparation of a statement of basis and purpose should play an integral part in the decisionmaking [sic] process. It ensures thoughtful consideration of the various issues raised *before* a decision is published. Even if the decision is made first and staff members are then in-

structed to prepare a supporting statement, that statement is likely to be scrutinized by the decisionmakers themselves before it is issued. And as long as the decision has not already been announced it is freely changeable if they are dissatisfied with the statement. [Emphasis in original.]

■ In this case, the Commission voted to adopt the numerical standards at its December public meeting. It then asked its counsel to compile a statement of reasons based on its discussions by summarizing and identifying the weight it gave to the six statutory criteria. Then, at the public meeting on January 14, 1986, the Commission reviewed and edited the statement of reasons and voted to adopt it. The numerical standards were formally filed on January 30, 1986.

Applying the foregoing principles to the facts here, we conclude that the statement of reasons is not a *post hoc* rationalization as it was compiled, edited and adopted before the regulations were filed. *See Independent U.S. Tanker Owners Comm. v. Lewis; Smith v. F.T.C.*

### C. Alleged alteration of the record.

Tenneco alleges that the Commission impermissibly altered the minutes of its December meeting in order "to obscure the public record" as to whether it had obeyed the statutory mandate. The alleged alteration is found in a comparison between the transcripts of the December meeting and the January meeting, where a draft of the minutes of the earlier meeting was under review:

[December 10, 1985]

[Chairman]:

\* \* \* \* \* \*

I think there is one basic question underlying the record and that question is what is the evidentiary threshold necessary for regulation of a chemical as toxic or as a human cancer risk. Part of that question it seems to me necessarily for a rule-making body like the Commission has to be how does this Commission meet its mandated responsibility to prevent

and abate water pollution from specific chemicals when that threshold has not been achieved * * *.

[January 14, 1986]

[Commission Member]: In the middle of the second paragraph, in the sentence that starts "How does the Commission as a rulemaking body meet its mandated responsibility to prevent and abate water pollution from specific chemicals when that evidentiary threshold has not been achieved." My understanding was that the comment was something on the order of this: When hard data may be unavailable because the inquiry is at the frontiers of science. I don't know whether that change conforms * * *.

Mr. Chairman: That certainly was the intent of the comment, since the Chair made the comment. Are you suggesting that the phrase as drafted be changed as you have worded it?

[Commission Member]: Yes.

This change was incorporated into the final December minutes.

Minutes are "a series of brief notes taken to provide a record of proceedings." *Webster's Third New International Dictionary* 1440 (1966). Tenneco has not shown that the minutes are required to be a verbatim transcript. Additionally, as both colloquies appear verbatim in the transcript of record, we find no alteration that would obscure the public record.

D. *Technical achievability of the numerical standards.*

■ Navajo argues that the adoption of the numerical standards was arbitrary and capricious because they may not be technically achievable. For the requirement that an agency must demonstrate the achievability of the proposed standard, Navajo relies on *National Lime Ass'n v. Environmental Protection Agency,* 627 F.2d 416 (D.C.Cir.1980) (holding that the new source performance standards for lime-manufacturing plants were arbitrary and capricious because of inadequate proof of achievability from the EPA test data). *National Lime Ass'n* considered Section 111 of the

Federal Clear Air Act, 42 U.S.C. § 7411 (Supp. I 1977), which requires that new source performance standards reflect "the degree of emission limitation * * * achievable through the application of the best technological system * * * which * * * the Administrator determines has been adequately demonstrated." 42 U.S.C. § 7411(a)(1)(C). Navajo likens the technically achievable standard in *National Lime Ass'n* to the requirement in Section 74–6–4(D)(3) of the Water Quality Act that the Commission shall give weight to "technical practicability" in its rule-making.

Section 111 of the Federal Clean Air Act can be distinguished from Section 74–6–4(D). The former requires a twofold showing that: (1) the proposed standard be "achievable" and (2) the control system considered to meet the standard be "adequately demonstrated." 42 U.S.C. § 7411(a); *National Lime Ass'n,* 627 F.2d at 430. The latter requires only a showing that the proposed standard be "achievable through application of the best demonstrated control technology." Section 74–6–4(D)(3) directs the Commission, in determining achievability, to consider technical practicability, economic reasonableness, and previous experience with the methods available. As set forth in part III(A) of this opinion, the record contains evidence of such consideration.

Section 3–101 of the Commission's regulations states the preventive purpose in the use of the numerical standards. It provides that if the existing concentration of contaminants is below the limit of the standard, degradation of the groundwater up to that limit will be allowed. If the existing concentration of contaminants in the groundwater exceeds the limit, no further degradation of the groundwater will be permitted.

Navajo alleges that an EID witness established the technical impossibility of meeting the numerical standards. We disagree. In the following testimony cited by Navajo, the witness explains EID practices in remedial clean-up actions, and not in prevention:

Q. What is the purpose of making numerical standards?

A. The numerical standards, as I said in my direct testimony, are largely used for preventive purposes. In remedial investigations, they are used as cleanup targets * * *. If the technology is inadequate to purify the water down to the level of the standard—the numerical standard, then that's the best we can do.

From our review of the evidence, we find that the numerical standards are achievable through demonstrated control technology for the purpose of prevention. We conclude that the adoption of the numerical standards was not arbitrary and capricious, as they are technically achievable within the meaning of Section 74–6–4(D).

### E. *Disclosure of basic data.*

Tenneco claims that EID, as a constituent agency of the Commission, failed to disclose the data on which the numerical standards were based and that the failure was contrary to law. Specifically, Tenneco had asked EID's expert witnesses if they were relying on any single key reference out of the list of six references EID provided prior to the public hearing. The witnesses responded that there was "no singular key reference for any one of those standards" and that standard setting was far too complex a subject to rely on only one key reference.

Tenneco contends that without a key reference designation, it was denied an opportunity to comment on the reference material. Tenneco cites no New Mexico authority for this designation requirement. Rather it relies on *United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240 (2nd Cir.1977) (holding that the Food and Drug Administration's failure to disclose the scientific data on which it relied in promulgating its regulations for processing smoked whitefish was procedurally erroneous). *Nova Scotia Food Products Corp.* can be distinguished because there, the FDA failed to disclose references, while here, the EID provided references on which its numerical standards were based but was simply unable to reduce those references to a single key reference.

Section 74–6–6 provides that: the Commission shall give thirty-day advance notice of a public hearing; it shall provide copies of proposed regulations; and at the hearing, it "shall allow all interested persons reasonable opportunity to submit data, views or arguments orally or in writing and to examine witnesses testifying at the hearing." These requirements were met. In addition, two public meetings were held regarding the hearing, and Tenneco was allowed to supplement the record with post-hearing documents before the regulations were filed.

Given the extensive nature of the public meetings and public hearing, with an opportunity to present evidence and cross-examine witnesses and with the prehearing disclosure of the six references, we find that the allegation of concealment of basic data is without merit.

### F. *Protection without the numerical standards.*

■ Navajo contends that the numerical standards should be set aside because the Commission has other means to protect groundwater, since all fourteen compounds could be included with the toxic pollutants defined and listed in Section 1–101.UU of the Commission's regulations. Tenneco does not dispute that the compounds for which the Commission set standards are capable of causing ill effects on health; rather, it questions the Commission's compliance with the law in establishing the standards.

A principal reason given by the Commission for the adoption of numerical standards was to protect the public health through the *prevention* of water pollution. The record indicates that the list of toxic pollutants in Section 1–101.UU applies to remedial actions in the discharge permitting process and not to prevention. There was testimony that it would be highly inefficient and difficult to regulate contaminant dischargers by relying on Section 1–101.UU and that numerical standards would give specific notice to the regulated community of the limits in discharging.

The Commission has the power to adopt water quality standards and to promulgate "regulations to prevent or abate water pollution"; it also has the discretion to "specify a standard of performance for new sources" to reduce effluents, including a "standard permitting no discharge of pollutants." § 74–6–4. We conclude from our review of the record that the Commission's adoption of numerical standards was a reasonable exercise of that statutory power.

## IV. SUBSTANTIAL EVIDENCE

■ Appellants argue that the adoption of numerical standards is not based on substantial evidence because the Commission ignored the testimony of opponents' witness and because the record does not contain sufficient evidence to allow the consideration of the six criteria mandated in Section 74–6–4(D).

Section 74–6–7(C)(2) of the Water Quality Act requires this court to set aside regulations that are "not supported by substantial evidence in the record." Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Rinker v. State Corp. Comm'n*, 84 N.M. 626, 506 P.2d 783 (1973).

For administrative appeals, the substantial evidence rule is supplemented with the whole record standard for judicial review of findings of fact made by administrative agencies. *Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.* In a whole record review, the review is "not * * * limited to those findings most favorable to the agency order." *Groendyke Transp., Inc. v. New Mexico State Corp. Comm'n*, 101 N.M. 470, 477, 684 P.2d 1135, 1142 (1984). The reviewing court must also look to evidence that is contrary to the findings and then decide whether, on balance, the agency's decision was supported by substantial evidence. *See Trujillo v. Employment Sec. Dep't*, 105 N.M. 467, 734 P.2d 245 (Ct.App.1987). When the agency's decision is supported by substantial evidence the reviewing court does not reweigh the evidence to reach a contrary result; however, when the evidence as a whole does not support the agency's deci-

sion, that decision cannot be upheld. *See* and *cf. Cibola Energy Corp. v. Roselli*, 105 N.M. 774, 737 P.2d 555 (Ct.App.1987).

Applying the whole record standard to the facts and circumstances in this case, we hold that there is substantial evidence in the record as a whole to support the Commission's adoption of the numerical standards.

Federal courts have also found that the substantial evidence standard of review calls for a deference to the agency's conclusions where they are based on judgments on the "frontiers of scientific knowledge." *See, e.g., Hercules, Inc. v. Environmental Protection Agency*, 598 F.2d 91, 106 (D.C. Cir.1978); *Industrial Union Dep't, AFL–CIO v. Hodgson*, 499 F.2d 467, 474 (D.C. Cir.1974). Similarly, in a determination of possible impairment to a water supply, the New Mexico Supreme Court has stated that: "[t]he special knowledge and experience of state agencies should be accorded deference." *Stokes v. Morgan*, 101 N.M. 195, 202, 680 P.2d 335, 342 (1984).

■ Navajo urges us to incorporate the legal residuum rule into our standard of review. In that event, the Commission's action would require support by some evidence that would be admissible in a jury trial. *See Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.* Navajo acknowledges that in New Mexico, the legal residuum rule applies only in adjudicative proceedings, and not in rule-making proceedings. We are not persuaded by Navajo's argument, as it has failed to show that this rule-making proceeding is sufficiently like an adjudication so as to invoke the legal residuum rule.

For the foregoing reasons, we affirm the Commission's decision adopting regulations that set numerical standards for the fourteen organic compounds in groundwater.

IT IS SO ORDERED.

DONNELLY, C.J., and APODACA, J., concur.