2007-NMCA-010

150 P.3d 991

**In the Matter of the Petition to Amend Ground Water Quality Standards Contained in 20.6.2 NMAC NEW MEXICO MINING ASSOCIATION and New Mexico Oil and Gas Association, Appellants,**

v.

**NEW MEXICO WATER QUALITY CONTROL COMMISSION, New Mexico Environment Department, and New Mexico Department of Health, Appellees,**

and

**Eastern Navajo Diné Against Uranium Mining, Intervenor–Appellee.**

Nos. 25,186, 25,191.

Court of Appeals of New Mexico.

Nov. 22, 2006.

Comeau, Maldegen, Templeman & Indall, LLP, Jon J. Indall, Stephen J. Lauer, Sharon W. Horndeski, Santa Fe, NM, for Appellant New Mexico Mining Association.

Miller Stratvert P.A., J. Scott Hall, Santa Fe, NM, for Appellant New Mexico Oil and Gas Association.

Patricia A. Madrid, Attorney General, Zachary A. Shandler, Assistant Attorney General, Charles F. Noble, Special Assistant Attorney General, Jerry A. Dickinson, Special Assistant Attorney General, Santa Fe, NM, for Appellees.

New Mexico Environmental Law Center, Eric D. Jantz, Douglas Meiklejohn, Roderick Ventura, Sarah Piltch, Santa Fe, NM, for Intervenor–Appellee Eastern Navajo Diné Against Uranium Mining.

## OPINION

CASTILLO, Judge.

{1} In this case, we review the action of New Mexico's Water Quality Control Commission (Commission) in revising the water quality standard for uranium in groundwater. We conclude that the Commission properly amended the standard pursuant to NMSA 1978, § 74–6–4(C) (2003), and that credible scientific data existed in the record to support its action. Appropriate review of Appellants' remaining concerns can be conducted only after the standard has been applied to a fact-specific situation. Accordingly, we affirm.

## I. BACKGROUND

### A. Facts

{2} In October 2002, the New Mexico Environment Department (Department) petitioned the Commission to revise New Mexico's numeric human · health standard for uranium in groundwater. *See* NMSA 1978, § 74–6–6(B) (1993); 20.6.2.3103(A)(12) NMAC. The Department asked the Commission to lower the standard for uranium

from 5 milligrams per liter (mg/L) to 0.007 mg/L because of the toxic effects of uranium on the public's health and particularly because the state has a high Native American and Hispanic population, which is especially susceptible to those effects.[1]

{3} Prior to filing its petition, the Department requested public comment from interested parties. Interested parties, including the New Mexico Mining Association (NMMA) and the New Mexico Oil and Gas Association (NMOGA) (together, Appellants), had the opportunity to submit comments and to participate in seven days of hearing, over the course of several months, where substantial scientific, medical, and technical testimony was presented. After public deliberation in June 2004, the Commission voted unanimously to change the numeric standard for uranium in groundwater from 5 mg/L to 0.03 mg/L, pursuant to Section 74–6–4(C). Subsequently, the Commission issued its statement of reasons with its final order, from which Appellants appeal.

{4} The new standard, 0.03 mg/L is the same as the United States Environmental Protection Agency's (EPA) standard for drinking water. *See* 40 C.F.R. § 141.66(e) (2005). The parties agree that the previous standard, 5 mg/L, is not protective of public health. Because it was the standard in effect at the pertinent times, the 5 mg/L standard was used by uranium operators to develop remediation and closure strategies. Of those mine and mill sites where documentation exists, the groundwater samples at all but one site are in compliance with the 5 mg/L standard. The Commission's new standard for uranium became effective for new water discharges on September 26, 2004, and it becomes effective on June 1, 2007, for past discharges and discharges in existence as of September 26, 2004. *See* 20.6.2.3103 note NMAC.

### B. Appellants' Arguments

{5} Appellants challenge the amendment to the numeric standard for uranium on

---

1. Appellant refers to the standard in parts per billion (ppb). The Final Order uses micrograms per liter (g), at least one of the witnesses uses parts per million in his testimony, and the regulation that contains the standard uses milligrams. We use milligrams per liter (mg/L) because this is the measurement used in the regulation that identifies the standard. *See* 20.6.2.3103(A)(12) NMAC.

grounds that the standard is unattainable and economically infeasible when applied to abatement of contamination at uranium mills or mines. Since existing abatement plans are not affected, we understand that Appellants' concerns center primarily on the effect of the new standard on abatement currently conducted under discharge plans and on new abatements that would be required under the revised standard. *Compare* 20.6.2.3109(E) NMAC *with* 20.6.2.4101(B) NMAC. Secondarily, Appellants express concern regarding the effect of the new standard on future mining.

{6} Appellants contend that the Commission's action was arbitrary and capricious and a violation of New Mexico's Water Quality Act, NMSA 1978, §§ 74–6–1 to –17 (1967, as amended through 2005) (WQA), because the revised standard is unattainable. They argue that the Commission was required to adopt the revised standard pursuant to Section 74–6–4(D) and that therefore the Commission acted improperly because it failed to consider technical feasibility and economic reasonableness and failed to establish the existence of "available demonstrated control technology." Thus, Appellants assert that the Commission failed to engage in reasoned decision making and, consequently, ask this Court to reverse the decision of the Commission. *See Atlixco Coal. v. Maggiore*, 1998–NMCA–134, ¶ 2, 125 N.M. 786, 965 P.2d 370 (remanding for "more reasoned decision making"). We review the Commission's actions pursuant to NMSA 1978, § 74–6–7 (1993).

## C. Statutory and Regulatory Framework

{7} An overview of the relevant statutes and regulations is essential to our analysis. The Commission was created by the WQA. *See* § 74–6–3; *Bokum Res. Corp. v. N.M. Water Quality Control Comm'n*, 93 N.M. 546, 555, 603 P.2d 285, 294 (1979) (stating that the objective of the WQA is to abate and prevent water pollution). The Commission is authorized to adopt water quality standards, which "shall at a minimum protect the public health or welfare, enhance the quality of water and serve the purposes of the Water Quality Act." Section 74–6–4(C). It is also empowered to adopt regulations for the prevention or abatement of water pollution. Section 74–6–4(D). To protect groundwater, the Commission has adopted regulations and standards, including human health standards, that control discharges and provide for remediation and protection of groundwater for use as domestic and agricultural water supply. *See* 20.6.2.3101(A); .4101(A) NMAC. The human health standards include the numeric standard for uranium. 20.6.2.3103(A) NMAC.

{8} The Commission is administratively attached to the Department, which is a "constituent agency" charged with implementing regulations promulgated by the Commission. Sections 74–6–2(K)(1), –3(F), –8; *see* §§ 74–6–5, –9; 20.6.2.7(N) NMAC. As a constituent agency under the WQA, the Department is charged with issuing permits for the discharge of water containing identified contaminants, Section 74–6–5(A); 20.6.2.3104 NMAC, and administering regulations regarding abatement of pollution. *See* § 74–6–4(E); 20.6.2.4104(A) NMAC; *see also* §§ 74–6–9, –11. The numeric human health standards established by the Commission are incorporated by reference into regulations that guide the Department in its administration of discharge permits and abatement plans. *See* 20.6.2.3101, .3104, .4103(B), .4104 NMAC. The Department is directed to deny an application for a discharge permit if, inter alia, (1) the discharge would not meet applicable effluent regulations, standards of performance or limitations; (2) any provision of the WQA would be violated, or; (3) "the discharge would cause or contribute to water contaminant levels in excess of any state or federal standard," to be determined by measuring the effect of the discharge on groundwater "at any place of withdrawal of water for present or reasonably foreseeable future use." Section 74–6–5(E). Thus, regulations regarding discharge permits incorporate by reference the numeric standard for uranium, and a regulated entity could be subject to consequences for failure to meet the standard. *See, e.g.,* 20.6.2.3101(A)(1)-(2) NMAC (using the standards to determine whether degradation of the groundwater will be allowed); 20.6.2.3107(A)(11) NMAC (requiring a closure plan that will "prevent the excee-

dance of [water quality] standards ... in ground water ... or abate such contamination"); 20.6.2.3109(C)(2) NMAC (providing that a proposed discharge plan, modification, or renewal cannot result in concentrations in excess of the standards at any place of withdrawal of water for present or reasonably foreseeable future use, unless an exception applies); 20.6.2.3109(E) NMAC (providing that noncompliance with the standards, "in ground water at any place of withdrawal for present or reasonably foreseeable future use," may result in a discharge permit modification that requires abatement or prevention); 20.6.2.3109(F) NMAC (providing that if a discharge permit is terminated or expires, an abatement plan may be required if contamination levels exceed or will exceed standards).

{9} Regulations regarding abatement plans also incorporate the numeric standard for uranium. *See* 20.6.2.4103(B) NMAC (requiring abatement of groundwater pollution, at any place of withdrawal for present or reasonably foreseeable future use, to conform to the groundwater standards); *see also* 20.6.2.4101(B) NMAC (requiring abatement by the person responsible for a background concentration of a water contaminant that exceeds the groundwater standards). The purpose of the abatement regulations is to remediate or protect all groundwater for use as domestic and agricultural water supply. 20.6.2.4101(A)(1) NMAC. If a person responsible for contamination cannot meet the abatement standards through the use of appropriate technology and procedure, the secretary may approve a technical infeasibility proposal involving the use of experimental abatement technology, provided the resulting concentration of contaminants is no greater than 200 percent of the standard for that contaminant. 20.6.2.4103(E) NMAC. If the 200 percent limit on concentration is technically infeasible, the responsible person may file a petition with the commission for alternative abatement standards or for a variance. 20.6.2.4103(E)(3) NMAC; *see also* 20.6.2.4103(F) NMAC. The petitioner must show either that compliance is technically infeasible when the responsible party makes "the maximum use of technology within the economic capability of the responsible per-

son," or that "there is no reasonable relationship between the economic and social costs and benefits." 20.6.2.4103(F)(1)(a) NMAC. In addition, the responsible person must show that the proposed alternative standards are achievable, justifiable, and will not cause undue damage to property or create a present or future hazard to public health. 20.6.2.4103(F)(1)(b)-(c) NMAC.

## II. DISCUSSION

### A. Standard of Review

{10} As an appellate court, we ask whether the Commission's action was arbitrary, capricious, or an abuse of discretion; not supported by substantial evidence in the record as a whole; or otherwise not in accordance with law. Section 74-6-7(B). We address Appellants' arguments first in the context of each standard of review. We then address the remaining arguments. Because Appellants' arguments rest on the assertion that the Commission must act pursuant to Section 74-6-4(D), we begin by asking whether the Commission acted in accordance with law when it adopted the revised standard pursuant to Section 74-6-4(C).

### B. Otherwise Not in Accordance With Law

{11} A ruling that is not in accordance with law should be reversed "if the agency unreasonably or unlawfully misinterprets or misapplies the law." *Archuleta v. Santa Fe Police Dep't,* 2005-NMSC-006, ¶ 18, 137 N.M. 161, 108 P.3d 1019. We are not bound by an agency's interpretation of a statute, since it is a matter of law that is reviewed de novo. *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n,* 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806; *Colonias Dev. Council v. Rhino Envtl. Servs., Inc.,* 2003-NMCA-141, ¶ 5, 134 N.M. 637, 81 P.3d 580, *rev'd on other grounds,* 2005-NMSC-024, ¶ 1, 138 N.M. 133, 117 P.3d 939. Rules, regulations, and standards that have been enacted by an agency are presumptively valid and will be upheld if reasonably consistent with the authorizing statutes. *See Tenneco Oil Co. v. N.M. Water Quality*

*Control Comm'n,* 107 N.M. 469, 473, 760 P.2d 161, 165 (Ct.App.1987).

{12} When construing a statute, we begin with the plain language, and we assume that the ordinary meaning of the words expresses the legislative purpose. *Regents of the Univ. of Cal. v. N.M. Water Quality Control Comm'n,* 2004–NMCA–073, ¶ 18, 136 N.M. 45, 94 P.3d 788. If, however, the plain language of a statute creates an absurd or unreasonable result, we will reject the literal language. *Phelps Dodge Tyrone, Inc. v. N.M. Water Quality Control Comm'n,* 2006–NMCA–115, ¶ 15, 140 N.M. 464, 143 P.3d 502. Our main goal is to give effect to the legislature's intent. *Wilson v. Denver,* 1998–NMSC–016, ¶ 36, 125 N.M. 308, 961 P.2d 153. We ascertain the intent of the legislature by reading all the provisions of a statute together, along with other statutes in pari materia. *Id.; see Tenneco,* 107 N.M. at 473, 760 P.2d at 165 ("[T]he reviewing court ... will read an act in its entirety and construe each part in order to produce a harmonious whole."). We also consider the history and background of the statute, as we harmonize the language in a manner that facilitates the operation of the statute and the achievement of its goals. *Phelps Dodge Tyrone,* 2006–NMCA–115, ¶ 15, 140 N.M. 464, 143 P.3d 502; *Regents,* 2004–NMCA–073, ¶ 18, 136 N.M. 45, 94 P.3d 788. Agency rules are construed in the same manner as statutes. *N.M. Dep't of Health v. Ulibarri,* 115 N.M. 413, 416, 852 P.2d 686, 689 (Ct.App.1993).

{13} Appellants contend that the Commission must adopt a revised standard pursuant to Section 74–6–4(D) and thus were required to consider technical feasibility and economic reasonableness of the proposed standard. The Commission, according to Appellants, must determine that a proposed standard is "achievable through application of the best available demonstrated control technology, processes, operating methods or other alternatives" before adopting that standard. *See* Section 74–6–4(D). We disagree.

{14} The plain language of the statute supports the Commission's action when it adopted the revised standard pursuant to Section 74–6–4(C). Subsection C delegates authority to the commission to adopt water quality standards and provides guidance for adopting these standards: "In making standards, the commission shall give weight it deems appropriate to all facts and circumstances, including the use and value of the water for water supplies, propagation of fish and wildlife, recreational purposes and agricultural, industrial and other purposes[.]" Section 74–6–4(C). In contrast, Subsection D delegates authority to the commission to adopt regulations for the prevention and abatement of water pollution and provides guidance for adopting these regulations: "In making regulations, the commission shall give weight it deems appropriate to all relevant facts and circumstances, including ... the social and economic value of the sources of water contaminants [and] technical practicability and economic reasonableness of reducing or eliminating water contaminants from the sources involved[.]" Section 74–6–4(D)(2)–(3). The plain language of each subsection, "in making standards" and "in making regulations," indicates the legislature's intent to distinguish both between water quality standards and regulations regarding water pollution and between the procedures by which each are adopted. *See* § 74–6–4(C)–(D).

{15} Appellants rely on additional language in Subsection D to argue that the Commission must make a determination that the standard was achievable: "Regulations ... may specify a standard ... that the commission determines to be achievable through application of the best available demonstrated control technology, processes, operating methods or other alternatives[.]" Section 74–6–4(D). Appellants read this language out of context. The sentence reads in full:

Regulations shall not specify the method to be used to prevent or abate water pollution but may specify a standard of performance for new sources that reflects the greatest reduction in the concentration of water contaminants that the commission determines to be achievable through application of the best available demonstrated control technology, processes, operating methods or other alternatives, including where

practicable a standard permitting no discharge of pollutants.

*Id.*

{16} Read in context, the language upon which Appellants rely is a condition limiting the commission's authority to adopt regulations that specify a standard of performance for new sources. Reading the language of all the provisions of the statute together, we conclude that the legislature intended to distinguish between factors the Commission could consider when adopting a water quality standard, *see* § 74–6–4(C), and a determination that the Commission must make when it adopts a regulation that specifies a standard of performance for new sources. *See* § 74–6–4(D). Appellants do not argue that the Commission specified a standard of performance for new sources. Thus, we conclude that the legislature intended the commission to consider the factors identified in Subsection C when it adopts water quality standards to protect human health. *See* 74–6–4(C) ("The standards shall at a minimum protect the public health or welfare, enhance the quality of water and serve the purposes of the Water Quality Act."). We hold that the Commission acted in accordance with law when it adopted the revised water quality standard for uranium because the Commission did not unreasonably or unlawfully misinterpret or misapply the authorizing statute. *Cf. Archuleta,* 2005–NMSC–006, ¶ 18, 137 N.M. 161, 108 P.3d 1019 ("We should reverse the ruling if the agency unreasonably or unlawfully misinterprets or misapplies the law[.]").

{17} Our interpretation of the current statutory language is supported by *Regents,* 2004–NMCA–073, ¶ 3, 136 N.M. 45, 94 P.3d 788 (discussing the application of water quality standards to surface waters). In *Regents,* the appellant argued that a sentence applying the standards to ephemeral tributaries was a regulation and that the commission's actions should therefore have complied with Subsection D. *Id.* ¶ 25. In responding to this argument, we addressed the difference between a standard and a regulation: "[A] standard defines the amount of contaminant in the . . . water and . . . a regulation defines the conduct necessary for an entity that dis-

charges pollutants to comply with the standard." *Id.* We also distinguished between setting limits on effluent that is discharged and setting water quality standards. *Id.* ¶¶ 25, 27. Limits on effluent, which are "typically based on the best available technology," are measured against the standards to determine whether the limits are adequate to protect human health. *Id.* ¶¶ 16, 27. We concluded that the language at issue was not a regulation subject to Subsection D because the sentence did not regulate the effluent as argued by the appellant. *Id.* ¶¶ 25, 27 (noting that the possibility of "more stringent effluent limits in [the appellants'] permit [as a result of the state's standard] does not support a conclusion that the state's standard is consequently a regulation").

{18} While we recognize that *Regents* dealt with water quality standards as incorporated in surface water regulations and enacted to comply with minimum standards established by the federal Clean Water Act, *see Regents,* 2004–NMCA–073, ¶¶ 4, 7, 136 N.M. 45, 94 P.3d 788; *see also* 33 U.S.C. § 1313(a)-(c) (2000), we find the distinction between regulating effluent and setting water quality standards to be helpful in our case. Here, similar to the language at issue in *Regents,* the revised standard is not used to measure contaminants in effluent and thereby directly regulate Appellants' conduct; rather, the standard is used to measure contaminants in groundwater. 20.6.2.3103 NMAC. Moreover, the standard is generally applied "at any place of withdrawal for present or reasonably foreseeable future use." *See, e.g.,* § 74–6–5(E) (providing that the Department shall deny an application for a permit if the discharge's effect on groundwater, "measured at any place of withdrawal of water for present or reasonably foreseeable future use," would result in water contaminant levels in excess of a federal or state standard); 20.6.2.7(AA) NMAC (defining a "hazard to public health" by incorporating the water quality standards and directing the secretary to "investigate and consider the purification and dilution reasonably expected to occur from the time and place of discharge to the time and place of withdrawal for use as human drinking water" when "determining whether a discharge would

cause a hazard to public health to exist"); 20.6.2.4103(B) NMAC ("Ground-water pollution at any place of withdrawal for present or reasonably foreseeable future use ... shall be abated to conform to the ... [water quality] standards[.]").  The distinction between standards that measure the level of contamination in groundwater used for domestic purposes and standards that measure the level of contaminants in a discharge reflect the flexibility necessary to set limits that are practical for facilities while protecting the public from the risks of consuming water that could be affected by those discharges.  *See Phelps Dodge Tyrone*, 2006–NMCA–115, ¶ 33, 140 N.M. 464, 143 P.3d 502.

{19} Appellants rely on *Tenneco* to support their claim that when the commission adopts a new standard, the commission must determine achievability by considering the "technical practicability, economic reasonableness, and previous experience with the methods available."  *See* 107 N.M. at 475, 760 P.2d at 167.  In *Tenneco*, this Court considered Section 74–6–4 and the commission's duties in adopting regulations that established numeric water quality standards. 107 N.M. at 470, 472–73, 760 P.2d at 162, 164–65.  We conducted our review of the commission's actions using the factors of Subsection D, *Tenneco*, 107 N.M. at 472, 760 P.2d at 164, because at that time Subsection C did not enumerate the factors necessary for adopting water quality standards.  *See* NMSA 1978, § 74–6–4(C) (1984).  At the time *Tenneco* was decided, Subsection C merely stated that the commission "shall adopt water quality standards as a guide to water pollution control."  *Id.*  Subsequently, the legislature amended Subsection C to more clearly describe the water quality standards, to define the purpose of those standards, and to identify the factors that should be considered by the commission in making water quality standards.  *See* 1993 N.M. Laws, ch. 291, § 4; 2001 N.M. Laws, ch. 281, § 1.  Thus, *Tenneco's* discussion of Section 74–6–4, as it read before amendment, is not helpful in our analysis.

{20} Appellants further argue that the Subsection D factors for adopting regulations

"should at least be considered" because the standards have been incorporated into discharge and abatement regulations, and the Commission thus adopted a standard that will require the mining industry to abate groundwater to an unattainable standard. The regulations prohibit discharges that will result in concentrations of a contaminant in excess of the standards.  *See* 20.6.2.3106(C)(7) NMAC (providing that a proposed discharge plan will include "[a]ny additional information that may be necessary to demonstrate that the discharge permit will not result in concentrations in excess of the standards").  The regulations also require abatement to meet these standards in groundwater.  20.6.2.4103(B) NMAC ("Ground-water pollution at any place of withdrawal for present or reasonably foreseeable future use ... shall be abated to conform to the [groundwater] standards.").  The Department agrees: "These standards are applicable to discharges of effluent and leachate ... that may affect groundwater, and also to abatement, or clean-up, of groundwater that has been contaminated by discharges."  It is not clear under the facts of this case, however, how the new numeric standard will be applied as an abatement standard.  The new standard has not yet been applied to a discharge or an abatement at a uranium mine or mill site.  Nor is it clear how the old numeric standard was applied as an abatement standard.  Appellants' brief-in-chief discusses abatement that has taken place under the old standard of 5 mg/L: "Through 20 years of [pump-and-treat technology], ... contamination at one New Mexico site has been reduced from a high of [4–5 mg/L] ... to a more acceptable level of [2–4 mg/L] at monitoring points adjacent to the tailings."  Clearly, there are considerations requiring technical expertise that preface the determination of how a standard is applied to a particular site.  *Cf. Phelps Dodge Tyrone*, 2006–NMCA–115, ¶¶ 36–37, 140 N.M. 464, 143 P.3d 502.

{21} We understand the concerns expressed by Appellants regarding the feasibility of groundwater abatement using the new standard at a mine or mill site.  However, the posture of the case at hand does not present the facts necessary for appellate re-

view of their concerns. Until the new standard has been applied in a fact-specific manner, our review is limited to whether the Commission properly adopted a new water quality standard pursuant to its statutory authority. *See Rauscher, Pierce, Refsnes, Inc. v. Taxation & Revenue Dep't*, 2002–NMSC–013, ¶ 42, 132 N.M. 226, 46 P.3d 687 ("Rulemaking ... is prospective, and has a definitive effect on individuals only after the rule subsequently is applied." (internal quotation marks and citation omitted)); *U S West Commc'ns, Inc. v. N.M. State Corp. Comm'n*, 1998–NMSC–032, ¶ 8, 125 N.M. 798, 965 P.2d 917 ("As applied in the context of an administrative proceeding, the doctrine of ripeness serves to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." (internal quotation marks and citation omitted)); *N.M. Indus. Energy Consumers v. N.M. Pub. Serv. Comm'n*, 111 N.M. 622, 629–30, 808 P.2d 592, 599–600 (1991) ("The determination of finality must be based on pragmatic consideration of the matters at issue and analysis of whether the administrative body has in fact finally resolved the issues."). Our discussion regarding the difference between standards and effluent limits, as well as our recent opinion *Phelps Dodge Tyrone*, might prove helpful to the Department in this regard. *See* 2006–NMCA–115, ¶¶ 25–35, 140 N.M. 464, 143 P.3d 502 (discussing the reasonableness of permit conditions). For the foregoing reasons, we conclude that the Commission need not determine that there is "available demonstrated control technology" when it adopts a new water quality standard pursuant to Section 74–6–4(C).

**C. Arbitrary and Capricious—Consideration of the Statutory Factors**

{22} An agency action is arbitrary and capricious if it is unreasonable, if it provides no rational connection between the facts found and the choices made, or if it entirely omits consideration of important aspects or relevant factors of the issue at hand.

*Sierra Club*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806; *Atlixco*, 1998–NMCA–134, ¶ 24, 125 N.M. 786, 965 P.2d 370. In Section 74–6–4(C), the legislature directed the commission to "give weight it deems appropriate to all facts and circumstances, including the use and value of the water for water supplies, propagation of fish and wildlife, recreational purposes and agricultural, industrial and other purposes," when it is adopting standards.

{23} The Commission made its decision after considering the following facts presented in proceedings below. The new standard is the same as the United States Environmental Protection Agency's (EPA) standard for drinking water. *See* 40 C.F.R. § 141.66(e). Public water supply systems supplied by groundwater must meet the EPA drinking water standard. Approximately ninety percent of the people in New Mexico rely on groundwater for drinking water, and approximately ten percent of the population obtain their drinking water from private supply systems that are not subject to the federal drinking water standards. A witness for NMMA testified that a standard for groundwater expected to be used for domestic purposes should be the same as the drinking water standard. In setting the federal standard, the EPA determined that available scientific evidence indicated 0.02 mg/L would be protective of public health. It established a standard of 0.03 mg/L, however, because the health benefits of requiring 0.02 mg/L instead of 0.03 mg/L were minimal compared to the costs saved by permitting 0.03 mg/L. Moreover, the United States Court of Appeals for the District of Columbia ruled that the scientific evidence used by the EPA to set its standard of 0.03 mg/L for uranium was reasonable. *City of Waukesha v. EPA*, 320 F.3d 228, 254 (D.C.Cir.2003) (per curiam). Other health organizations have recommended a health-based standard ranging from 0.005 mg/L to 0.02 mg/L, based on chemical toxicity to the kidneys. The parties agree that the previous standard, 5 mg/L, is not protective of public health and that the revised standard, 0.03 mg/L, would be protective of public health.

{24} The Commission also considered the costs related to kidney disease occurring in New Mexicans. It considered the current inactive status of uranium production in New Mexico, which employs only 85 people between New Mexico and Nebraska. It considered the testimony of the Department's expert that it is feasible, through a variety of methods, to treat the uranium level to an acceptable concentration before a subsequent use. The Commission heard from NMMA experts who testified that the relationship between uranium in drinking water and overt disease is not clear and that the uncertainties require judgments in which there may be differences of opinion when doing health risk assessments. The Commission also considered that the Department would address other factors, such as the "social and economic value of the sources of the contaminants, technical practicability and economic feasibility," on a case-by-case basis when the standard is applied.

{25} After considering this testimony, the Commission concluded that a drinking water standard was appropriate for use as a groundwater standard because ninety percent of New Mexicans drink groundwater and because the groundwater is delivered to ten percent of New Mexicans through private supply systems that are unprotected by the EPA drinking water standard. The Commission also concluded that credible scientific data and other appropriate evidence indicated the uranium standard should be 0.03 mg/L. Although scientific evidence was presented by the Department in support of a lower standard (0.007 mg/L) for protection of public health, the Commission considered testimony regarding the difficulties of compliance with two different standards, for federal and state regulations, and determined that the revised standard should be the same as the federal standard. Thus, the Commission amended the uranium standard to 0.03 mg/L, instead of the proposed 0.007 mg/L, in order to fulfill its duty to "at a minimum protect the public health or welfare, enhance the quality of water and serve the purposes of the Water Quality Act." *See* § 74–6–4(C).

■ {26} The Commission considered these facts, relevant to Subsection C, regarding the use and value of the groundwater for domestic water supply and for mining purposes, and engaged in public deliberation before it unanimously adopted the revised standard. We cannot say that the Commission failed to engage in reasoned decision making as defined by Section 74–6–4(C); thus, we conclude that the Commission's action was not arbitrary and capricious. *Tenneco*, 107 N.M. at 473, 760 P.2d at 165 (stating that even though one may believe an erroneous conclusion has been reached, the action is not arbitrary and capricious when there is room for two opinions). The Commission gave weight it deemed appropriate to all facts and circumstances and independently concluded that the state water quality standard for groundwater should be the same as the federal water quality standard for drinking water. An agency's rule-making function is discretionary, and we will not substitute our judgment for that of the agency on that issue if there is no showing of an abuse of that discretion. *Tenneco*, 107 N.M. at 473, 760 P.2d at 165.

{27} Appellants rely on *National Lime Association v. EPA*, 627 F.2d 416 (D.C.Cir. 1980), to argue that the amendment to the numeric standard was arbitrary and capricious because the standard is "unachievable." In *National Lime*, the standards at issue were new source performance standards that specifically limited discharges emitted from active facilities. 627 F.2d at 422. As discussed above, the revised standard for uranium at issue today is not a new source performance standard or an effluent limit. *Cf. Tenneco*, 107 N.M. at 475–76, 760 P.2d at 167–68 (distinguishing between the application of numeric standards for prevention of contamination and the application of numeric standards for remedial clean-up actions). Thus, *National Lime* is not on point.

{28} Appellants also rely on *Industrial Union Department, AFL–CIO v. American Petroleum Institute (Benzene)*, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980), for the proposition that this Court should strike down the new standard for uranium because significant risk to human health posed by low levels of uranium is uncertain and the "cost of compliance far exceeds any realizable ben-

efits." Like the standard in *National Lime,* the standard in *Benzene* is different from the water quality standard at issue today. The standard in *Benzene* was a limit directly imposed on the employer at the place of business, thereby specifically regulating the conduct of the entity. 448 U.S. at 613, 100 S.Ct. 2844. As discussed earlier, water quality standards do not regulate the conduct of an entity; thus, we do not find *Benzene* applicable to the issue presented today.

{29} Appellants cite to a number of cases arguing that the Commission must determine a standard to be technologically feasible before it can be adopted. Given our conclusion that the water quality standard was properly adopted pursuant to Section 74–6–4(C), and the distinction we have made between standards imposed for water quality and standards imposed for effluent or discharges, these cases cited by Appellants are also inapposite. *See Am. Fed'n of Labor & Cong. of Indus. Orgs. v. OSHA,* 965 F.2d 962, 968 (11th Cir.1992) (reviewing air contaminant standards applicable to employee exposure in the workplace); *United Steelworkers of Am., AFL–CIO–CLC v. Marshall,* 647 F.2d 1189, 1204–06 (D.C.Cir.1980) (reviewing lead standards applicable to employee exposure in the workplace); *Wells Mfg. Co. v. Pollution Control Bd.,* 48 Ill.App.3d 337, 6 Ill.Dec. 497, 363 N.E.2d 26, 26–28 (1977) (reviewing an order that required a foundry to eliminate the discharge or odor emanating from the plant); *Commonwealth ex rel. State Water Control Bd. v. County Utils. Corp.,* 223 Va. 534, 290 S.E.2d 867, 870 (1982) (reviewing standards that limited nitrogen in effluent).

### D. Substantial Evidence—Credible Scientific Data

{30} Substantial evidence is evidence that a reasonable mind would recognize as adequate to support the conclusions reached by a fact-finder. *Wagner v. AGW Consultants,* 2005–NMSC–016, ¶ 85, 137 N.M. 734, 114 P.3d 1050; *Regents of the Univ. of N.M. v. N.M. Fed'n of Teachers,* 1998–NMSC–020, ¶ 17, 125 N.M. 401, 962 P.2d 1236. This Court reviews the record as a whole, in the light most favorable to the decision of the Commission, *Zia Natural Gas Co. v. N.M. Pub. Util. Comm'n,* 2000–NMSC–011, ¶ 25, 128 N.M. 728, 998 P.2d 564, and refrains from reweighing the evidence. *Regents,* 2004–NMCA–073, ¶ 29, 136 N.M. 45, 94 P.3d 788.

{31} Section 74–6–4(C) provides that the standards shall be "based on credible scientific data and other evidence appropriate under the Water Quality Act." The Commission heard testimony from the Department's three experts, all of whom testified in support of amending the standard to 0.007 mg/L. The Commission relied on the peer-reviewed Lewis study that addressed the toxic effects of uranium on humans, particularly chemical toxicity on the kidney. The Lewis study reviewed non-human animal studies of uranium toxicity and human exposure data and used an EPA recognized methodology, the exposure dose approach, to estimate a numeric standard for uranium in drinking water, 0.007 mg/L, that is protective of human health. The 0.007 mg/L proposed standard was based in part on the high incidence of kidney ailments that exist in several New Mexico populations, especially Native American and Hispanic communities, which are often located in areas of uranium deposits.

{32} The EPA methodology and the Lewis study documented uncertainty factors that were used to correct for uncertainties resulting from various extrapolations, within and between species, as well as other factors. Clinical studies of the effects of uranium on humans are not available because it is unethical to knowingly subject persons to a harmful exposure. One study, however, shows that people exhibited subclinical effects to their kidneys after being exposed to average concentrations ranging from 0.005 mg/L to 0.196 mg/L. The Commission also considered *City of Waukesha,* which held that the EPA's use of epidemiological data and non-human animal studies to set a drinking water standard for uranium of 0.03 mg/L was reasonable. 320 F.3d at 254 (concluding that "in the face of uncertain laboratory and epidemiological data, it was reasonable for EPA to take the risk-averse approach of relying on the animal laboratory data to develop a lower standard").

{33} Moreover, the Commission heard from epidemiologists and experts, who testified about populations in New Mexico that were especially sensitive to the toxic effects of uranium. One epidemiologist further testified that the proposed standard was based on credible scientific evidence and would be protective of public health. In addition, two experts spoke on behalf of NMMA. Both experts testified that the 5 mg/L standard does not protect public health. One NMMA expert testified that a standard for groundwater used as a domestic water resource should be the same as the standard for drinking water and, speaking as a risk assessor, recommended a drinking water standard between 0.03 and 0.1 mg/L. Another NMMA expert testified that the 0.03 mg/L standard would be protective of public health.

{34} Viewing the record as a whole, we conclude that substantial evidence exists in the record, based on credible scientific data, to support the Commission's actions. *See Bokum*, 93 N.M. at 554, 603 P.2d at 293 (stating that conflicting expert testimony is resolved in favor of the successful party on appeal); *Regents*, 2004–NMCA–073, ¶ 34, 136 N.M. 45, 94 P.3d 788 ("We find in the whole record ample evidence to affirm."). The EPA's reliance on similar data and the court's ruling on the reasonableness of this type of data in *City of Waukesha* further provide support for our conclusion. *See Benzene*, 448 U.S. at 656, 100 S.Ct. 2844 ("[The agency] is not required to support its finding that a significant risk exists with anything approaching scientific certainty.... [The statute] specifically allows the Secretary to regulate on the basis of the 'best available evidence.' ... [T]his provision requires a reviewing court to give [the agency] some leeway where its findings must be made on the frontiers of scientific knowledge. Thus, so long as they are supported by a body of reputable scientific thought, the [a]gency is free to use conservative assumptions in interpreting the data with respect to carcinogens, risking error on the side of overprotection rather than underprotection." (internal citations omitted)).

## E. Alternative Abatement Plans

{35} Appellants argue that the opportunity to petition for Alternative Abatement Standards (AAS), *see* 20.6.2.4103(F) NMAC, does not cure an "otherwise defective" regulation. Appellants contend that the AAS process involves a discretionary variance procedure, "haphazard at best," which allows a regulation to be applied using a "standard *du jour*." *See Bokum*, 93 N.M. at 552, 603 P.2d at 291 (holding that a regulation defining "toxic pollutants" was unconstitutionally vague). This appeal involves review of the standard adopted by the Commission; Appellants do not argue that the standard is unconstitutionally vague. Given our conclusion that the Commission properly adopted the revised standard pursuant to Section 74–6–4(C), this argument fails. To the extent that Appellants argue the AAS procedure is without any "guidelines for the exercise of the authority to approve or disapprove" an AAS, we disagree. *See Bokum*, 93 N.M. at 552, 603 P.2d at 291. As noted earlier, the regulations require determinations involving technical expertise that guide the Department in its application of the standard.

## F. Incorporation of the Standards Into Oil and Gas Regulations

{36} For the reasons discussed throughout the opinion, we conclude that the concerns of the NMOGA regarding implementation of the revised standard can be adequately reviewed only after the revised standard has been applied in a fact-specific manner. However, we briefly address NMOGA's other arguments. With inaccurate citations to the record, NMOGA asserts that the Commission's action was improper because the Commission failed to consider the effect of the revised standard on the Oil Conservation Division's (OCD) regulatory scheme and the oil and gas industry and because the Oil Conservation Division was not a party to the proceeding. We disagree. First, we observe that the Commission did hear testimony from the NMOGA. NMOGA's witness appeared on the final day of the hearing to ask the Commission to delay its revision of the standard, so the industry could look at the impact of the revised standard and provide that information to the Commission. The witness testified that he had "no expertise or techni-

cal knowledge to suggest that [the uranium standard] should be at one level or the other" and that he "couldn't tell you if there has been testing of produced water." Finally, he testified that NMOGA did not submit comments to the Department when the new standard was first proposed in 2001, even though the Department first began discussing the possibility of revised standards in the mid-1990's and had attempted to meet with NMOGA during the previous summer. If we found NMOGA's argument to be persuasive, any interested party could delay administrative action by ignoring adequate notice of the proceedings. NMOGA does not argue that it had inadequate notice of the hearing. In fact, the record reveals that notice was sent to NMOGA fifty-one days prior to the hearing.

{37} Second, Section 74-6-3(A)(4) specifically provides that the commission shall include the chairman of the oil conservation commission or a designated member of his staff. *See generally* NMSA 1978, § 70-2-4 (1987) (providing for the creation of the oil conservation commission); NMSA 1978, § 70-2-6 (1979) (discussing the jurisdiction of the division and the commission). NMOGA does not argue that the Commission failed to comply with Section 74-6-3(A)(4). Without more, we cannot conclude that the representative of the oil conservation commission, sitting as a member of the Commission as statutorily required, does not adequately represent the interests of the OCD and the industry it regulates.

## III. CONCLUSION

{38} The Commission properly adopted the revised water quality standard for uranium pursuant to Section 74-6-4(C). Concerns regarding the application of the standard can be adequately addressed only after the standard has been applied. Accordingly, we affirm the action of the Commission.

{39} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and CYNTHIA A. FRY, Judges.