**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2012-NMCA-106

Filing Date: August 8, 2012

Docket Nos. 30,500 consolidated with 30,869

GLENN WILCOX,

       Appellant,

v.

NEW MEXICO BOARD OF ACUPUNCTURE
AND ORIENTAL MEDICINE,

       Appellee.

APPEAL FROM THE BOARD OF ACUPUNCTURE
& ORIENTAL MEDICINE
Anita Villegas, Administrator

Glenn Wilcox
Placitas, NM

Pro Se Appellant

Gary K. King, Attorney General
Zachary Shandler, Assistant Attorney General
Justin Woolf, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**CASTILLO, Chief Judge.**

**{1}**    This Opinion consolidates two appeals by Glenn Wilcox (Appellant), a doctor of oriental medicine who is challenging two sets of regulations passed by the New Mexico Board of Acupuncture and Oriental Medicine (the Board). The first set consists of emergency regulations passed in June 2010 (Emergency Regulations); the second set consists of permanent regulations passed in October 2010 (2010 Regulations).

1

**{2}** We conclude that the Board acted contrary to its statutory authority in passing the Emergency Regulations, but we uphold the Board's approval of the 2010 Regulations. Accordingly, we reverse in part and affirm in part.

## I.   BACKGROUND

**{3}** We begin with a short history of the events underlying these two appeals. In 2000, under the Acupuncture and Oriental Medicine Practice Act (Practice Act), NMSA 1978, §§ 61-14A-1 to -22 (1993, as amended through 2007), the New Mexico Legislature authorized the Board to issue certifications, as determined by Board rule, for extended prescriptive authority for those substances enumerated in the statute. Section 61-14A-8.1 (2000). In late 2004, the Board approved regulations establishing a formulary to guide that expanded practice, and the formulary took effect in February 2005 (2005 Regulations or 2005 Formulary).

**{4}** In 2007, the Legislature amended the Practice Act to redefine the scope of the certificates for expanded practice and prescriptive authority. Section 61-14A-8.1 (2007). The available types of certifications in the expanded practice areas were increased to four: basic injection therapy, injection therapy, intravenous therapy, and bioidentical hormone therapy. Section 61-14A-8.1(B). The 2007 amendments also included additional substances and clarified that the compounding of drugs must comply with the compounding requirements for licensed health care professionals in the United States pharmacopoeia and national formulary. Section 61-14A-8.1(C), (D). In November 2007, soon after the amendments became law, the Board became aware that the updated Practice Act was subject to misinterpretation by practitioners and that confusion existed about which drugs and substances could be injected into patients. In that same year, the Board discussed cooperating with the Board of Pharmacy (BOP), which had expressed frustration with the 2005 Formulary's lack of specificity and definition. In early 2008, the Board established a joint committee with the BOP to address the matter. During 2008 and 2009, the Governor's Office, the BOP, the New Mexico Regulation and Licensing Department, as well as practitioners, makers of the substances, and members of the public brought their concerns to the Board regarding the confusion about what could and could not be prescribed, administered, compounded, and dispensed under Section 61-14A-8.1 and the 2005 Formulary.

**{5}** As a result of these concerns, the Board adopted new regulations in September 2009 (2009 Regulations). These regulations were the subject of Appellant's first appeal to this Court in November 2009. In May 2010, we set aside the 2009 Regulations because the Board had failed to communicate the reasons behind passage of the regulations. *See Wilcox v. N.M. Bd. of Acupuncture & Oriental Med.*, 2010 WL 4684756 (July 23, 2010).[1]

---

[1] We reissued the opinion in July 2010 after making technical changes.

**{6}**     These combined appeals represent Appellant's next two challenges to virtually the same set of regulations. After the 2009 Regulations were set aside, the Board responded less than a month later in June 2010 and, under its emergency powers provided by the Uniform Licensing Act (ULA), voted to re-adopt the regulations, making them effective for a 120-day period. *See* NMSA 1978, § 61-1-30 (1981). Appellant appealed the adoption of the Emergency Regulations, which expired in October 2010. The Board then held hearings in August and later in 2010. After admitting numerous exhibits, hearing testimony, public comment, and issuing more than one hundred findings of facts and conclusions of law, the Board voted to adopt the 2010 Regulations. Appellant then filed an appeal challenging these regulations. After setting out the standard of review, we will consider Appellant's two appeals in turn.

## II.     DISCUSSION

### A.     Standard of Review

**{7}**     "An administrative agency has no power to create a rule or regulation that is not in harmony with its statutory authority." *Rivas v. Bd. of Cosmetologists*, 101 N.M. 592, 593, 686 P.2d 934, 935 (1984). The Legislature may delegate legislative duties to a board, "but in so doing, boundaries of authority must be defined and followed." *Id.* We will set aside a regulation only if it is found to be "(1) arbitrary, capricious[,] or an abuse of discretion; (2) contrary to law; or (3) against the clear weight of substantial evidence of the record." NMSA 1978, § 61-1-31(C) (1981). We define "[a]rbitrary" and "capricious" acts as "those that may be considered wilful and unreasonable, without consideration, and in disregard of the facts and circumstances." *In re PNM Elec. Servs.*, 1998-NMSC-017, ¶ 24, 125 N.M. 302, 961 P.2d 147. And we take a deferential stance when judging whether a board abused its discretion:

> An agency's rule-making function involves the exercise of discretion, and a reviewing court will not substitute its judgment for that of the agency on that issue where there is no showing of an abuse of that discretion. Rules and regulations enacted by an agency are presumed valid and will be upheld if reasonably consistent with the statutes that they implement.

*Old Abe Co. v. N.M. Mining Comm'n*, 121 N.M. 83, 88, 908 P.2d 776, 781 (Ct. App. 1995) (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion." *In re PNM Elec.*, 1998-NMSC-017, ¶ 23. In reviewing a substantial evidence claim, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177. We conduct a whole record review to determine whether a board's decision is supported by substantial evidence. *AA Oilfield Serv., Inc. v. N.M. State Corp. Comm'n*, 118 N.M. 273, 275, 881 P.2d 18, 20 (1994). Additionally this Court "will not reweigh the evidence nor substitute our judgment for that

3

of the fact finder." *Las Cruces Prof'l Fire Fighters*, 1997-NMCA-044, ¶ 12. We review both sets of regulations under this standard.

## B. Emergency Regulations

**{8}** As we have explained, after this Court rejected the 2009 Regulations, the Board passed emergency regulations in June 2010 that were essentially the same as those adopted in 2009. Appellant contends that the Board's declaration of an emergency did not comply with the statutory definition of an "emergency" and that therefore the Board exceeded its authority. In response, the Board argues that the Emergency Regulations were needed to protect public safety and, because it was unclear which regulations, if any, were left in force after this Court's opinion a month earlier that had set aside the 2009 Regulations.

**{9}** As a preliminary matter, we observe that the time period during which the emergency rules were in effect lasted only 120 days; these regulations expired in October 2009. Thus, it appears that our first question is whether this appeal is moot. "An appeal is moot when no actual controversy exists, and an appellate ruling will not grant the appellant any actual relief." *State v. Sergio B.*, 2002-NMCA-070, ¶ 9, 132 N.M. 375, 48 P.3d 764. The Emergency Regulations are no longer in effect, so our decision in this regard would have no effect on the rights of the parties at this time. Accordingly, we conclude that this matter is moot. But our analysis does not end here. "As general rule, this Court does not decide moot cases." *Gunaji v. Macias*, 2001-NMSC-028, ¶ 9, 130 N.M. 734, 31 P.3d 1008. However, that rule is not absolute, and "[w]e may review moot cases that (1) present issues of substantial public interest or (2) . . . are capable of repetition yet evading review." *Cobb v. State Canvassing Bd.*, 2006-NMSC-034, ¶ 23, 140 N.M. 77, 140 P.3d 498. We will consider a case that is otherwise deemed to be moot if it presents us with "an important policy issue that is likely to occur again if the issue is not directly addressed." *Paragon Found., Inc. v. N.M. Livestock Bd.*, 2006-NMCA-004, ¶ 10, 138 N.M. 761, 126 P.3d 577.

**{10}** In *Leonard v. Payday Prof'l/Bio-Cal Comp.*, 2008-NMCA-034, ¶ 1, 143 N.M. 637, 179 P.3d 1245, a worker had sought injunctive relief, asking the district court to order the employer to pay for surgery while the employer appealed the compensation order of the workers' compensation judge (WCJ). We first settled the issue of the compensation order itself, thus mooting the need for injunctive relief. *See id.* ¶ 9. However, we went on to address the district court's denial of injunctive relief because the issue was "of substantial public interest" and "the procedural scenario that evolved in this case is capable of repetition while evading review, as long as the issue of whether a WCJ can grant injunctive relief remains open. The issue of injunctive relief will necessarily become moot by the time an appellate court decides the liability issue." *Id.* ¶ 10. In the fact pattern before us, as in *Leonard*, an administrative agency's emergency regulations will more often than not have expired by the time an appeal reaches this Court, thus evading review of an action based on powers that a board would use again when promulgating emergency regulations in other instances. We also consider the use of emergency powers to be an important policy matter of substantial public interest because of the potential for abuse of regulatory power by

administrative boards, especially when establishing rules affecting the public health and safety. Thus, we proceed with our analysis.

**{11}** We now turn to the merits of the appeal of the Emergency Regulations. The Uniform Licencing Act provides direction:

> If the board determines that an emergency exists which requires immediate action to protect the public peace, health, welfare or safety, it may, with the written concurrence of the governor, adopt a regulation or amendment or repeal thereof, and the emergency regulation shall become effective immediately upon its filing under the State Rules Act.

Section 61-1-30(A). The ULA further defines an "emergency" as that which "includes any man-made or natural disaster causing or threatening widespread physical or economic harm that is beyond local control and requires the resources of the state." NMSA 1978, § 61-1-2(F) (2002).

**{12}** Appellant contends that no substantial evidence was presented at the Board's hearing at which the regulations were passed to show that an emergency so defined was present. The Board counters by arguing that confusion on the part of licensed practitioners potentially endangered the health of thousands of residents and constituted an "emergency" that required the Board to act "conscientiously and reasonably" in the name of public health and safety. The Board argues that it reviewed a list of dangerous substances and that immediate action by the Board was required to prevent the injection of unsafe drugs and substances into patients.

**{13}** The Board contends that an emergency does not necessarily entail a man-made disaster and defends its actions by noting that the statute's use of the word "including" in its definition of "emergency" requires a broader reading than when the more precise word "means" precedes a phrase or list. It is true that "[a] statute which uses the word 'including' (certain things) is not limited in meaning to that included." *Wilson v. Rowan Drilling Co.*, 55 N.M. 81, 109, 227 P.2d 365, 383 (1950). And our Supreme Court has stated that "the use of the word 'includes' to connect a general clause to a list of enumerated examples demonstrates a legislative intent to provide an incomplete list of activities[.]" *United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 2010-NMSC-030, ¶ 13, 148 N.M. 426, 237 P.3d 728. However, the doctrine of *ejusdem generis* holds that "where general words follow words of a more specific meaning, the general words are not construed in their widest extent but are instead construed as applying to persons or things of the same kind or class as those specifically mentioned." *State v. Nick R.*, 2009-NMSC-050, ¶ 21, 147 N.M. 182, 218 P.3d 868 (internal quotation marks and citation omitted). We have previously looked to a dictionary definition of the word that precedes "including" to characterize the types of examples consistent with that key word. *See In re Estate of Corwin*, 106 N.M. 316, 317, 742 P.2d 528, 529 (Ct. App. 1987). In *Black's Law Dictionary* "emergency circumstances" is found under the entry for "exigent circumstances" and is defined as: "A situation that

5

demands unusual or immediate action and that may allow people to circumvent usual procedures, as when a neighbor breaks through a window of a burning house to save someone inside." *Black's Law Dictionary* 277 (9th ed. 2009). Webster's defines "emergency power" as "power granted to or used or taken by a public authority to meet the exigencies of a particular emergency (as of war or disaster) whether within or outside a constitutional frame of reference." *Webster's Third New Int'l Dictionary* 741 (Merriam-Webster 1993). Those definitions suggest an immediate threat that requires extraordinary action that would not be possible within the confines of statutory requirements.

**{14}** Here, no emergency existed of the type among the examples listed in the statute. Nor do the circumstances fall under the dictionary definitions of "exigent circumstances" or "emergency powers." No "man-made or natural disaster" was present requiring "immediate action" by the Board. The Board's adoption of the Emergency Regulations followed a discussion of the impact of this Court's opinion striking down the 2009 Regulations and the resulting confusion over which previous set of rules, if any, were in effect. However, no immediate threat to public health was apparent; in fact, the Board had spent two years crafting the 2009 Regulations, and another six months had passed while the regulations were being challenged on appeal. Whatever serious threat to public health that existed in June 2010 had existed for the previous two-and-a-half years. Our 2010 opinion struck the 2009 Regulations and placed the Board in the same position that it was in before the passage of those regulations less than a year earlier when no immediate threat to public health existed. We conclude that the Board's own state of confusion fails to qualify as an "emergency" of the same kind or class of events as characterized in the statute and as commonly defined. Therefore, we hold that the Board abused its discretion and acted contrary to law by declaring a sudden emergency and implementing emergency regulations for a 120-day period, thus short-circuiting the regulation adoption process required by law.

## C.    2010 Regulations

**{15}** We now consider the final version of the 2010 Regulations. Before we turn to the arguments raised in Appellant's brief in chief, we note that in his reply brief, Appellant asserts for the first time that the findings were not approved by the Board. This argument was not raised in the brief in chief and we therefore do not consider it here. *Mitchell-Carr v. McLendon*, 1999-NMSC-025, ¶ 29, 127 N.M. 282, 980 P.2d 65 (stating that, generally, the Court will not consider an argument raised for the first time in a reply brief, unless it is directed to new arguments or authorities presented in the answer brief). As a result, we address only the five points raised in the brief in chief. We take Appellant's five points in turn.

### 1.    Authority Under the Practice Act

**{16}** Appellant first argues that the Board acted contrary to law when it omitted substances authorized by the Practice Act and further when it limited the modes of administration of many of these substances. *Compare* § 61-14A-8.1, *with* 16.2.20.8 NMAC (11/28/10). The

Board argues that any substances missing from the 2010 Regulations were never authorized by the Practice Act. The Board agrees that in a number of cases, modes of administration are limited but that any limitation was based on substantial evidence regarding safe methods of administration as provided by the Governor's Office, Attorney General's Office, the BOP, the Regulation and Licensing Department, and practitioners.

**{17}** Appellant contends that the 2010 Regulations eliminated "hundreds of substances and many modes of administration authorized by the Practice Act." Specifically, Appellant mentions oxygen, epinephrine, bioidentical hormones, biological products, vitamins, enzymes, lipids, natural medicines, natural substances, and anticoagulant substances. He also contends that the 2010 Regulations eliminate herbal medicines, proteins, glandular products, protomorphogens, gerovital, dietary supplements, cosmetics, and non-prescription drugs when these substances are available by prescription. And he complains that caffeine, procaine, homeopathic medicines, minerals, amino acids, and live cell products are limited to one or two modes of administration.

**{18}** We first observe that Appellant does not provide record citations to the discussion of these substances and their modes of administration. *See* Rule 12-213(A)(4) NMRA. We also observe that the bulk of Appellant's argument is directed at modes of administration; he complains that the manner of administration of these substances is unlawfully limited. Appellant misreads the Practice Act. Section 61-14A-8.1(C) of the Practice Act states that the "expanded practice and prescriptive authority shall include . . . the prescribing, administering, compounding[,] and dispensing" of numerous substances, but the Practice Act does not require the Board to allow the enumerated substances to be administered by every mode of administration. On the contrary, Section 61-14A-8.1(A) conditions the certifications for expanded practice and prescriptive authority to those "certifications, as determined by rule of the [B]oard[.]" Section 61-14A-8(B) gives the Board the power to adopt "all rules necessary for the implementation" of the Practice Act. Consequently, the Board has the power to determine how the substances listed in Section 61-14A-8.1 are to be administered. Further, the Board is directed to "adopt the rules determined by the [BOP] for additional training required for the . . . administering" of a number of substances, and is further directed to consult with the BOP "as appropriate." *Id.* The purpose of the Practice Act is to protect the public, and this is achieved by reviewing and determining how the enumerated substances can be administered safely.

**{19}** We now turn to those substances we understand Appellant to have identified as completely missing from the 2010 Regulations: the enzyme urokinase, lipids, natural medicines, and total parenteral nutrition (TPN). Appellant agrees that except for urokinase, the 2010 Regulations allow enzymes to be administered by injection. The Board counters that urokinase was excluded from the category of enzymes in the 2005 Regulations and therefore has never been available for use. When the Board proposed regulation amendments, it recommended no change to the exclusion of urokinase. Although Appellant seems to be arguing that because the Practice Act includes enzymes, the regulations must necessarily include all enzymes. He offers no legal support for this premise; thus, we will

not consider it. *In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (stating that the court will not review issues raised on appeal that are unsupported by cited authority).

**{20}** Lipids and natural medicines are contained in the 2010 Regulations. Although lipids are not listed in 16.2.20.8 NMAC, they are still authorized under 16.2.2.10(B)(1) NMAC (11/28/09) on the list of substances permitted under the scope of expanded practice, and lipids are contained in the 2010 Regulations in the form of sodium morrhuate and phosphatidylcholine. *See* 16.2.20.8(F)(2), (3) NMAC. Natural medicines also are authorized under 16.2.2.10(B)(1) NMAC.

**{21}** Appellant also complains about the absence of TPN, but TPN is not a listed substance in the Practice Act. Appellant argues that its components are listed substances so it should be allowed. Again, Appellant provides no legal authority for this premise; thus, we decline to consider it. *Adoption of Doe*, 100 N.M. at 765, 676 P.2d at 1330.

**{22}** After reviewing Appellant's arguments regarding elimination of substances and modes of administration, we conclude there is no basis to overturn the 2010 Regulations on these grounds.

## 2. Evidence of John Pieper

**{23}** Appellant also claims that the main evidence the Board relied on—the expert testimony of former Board chairman John Pieper—was insufficient to support the Board's actions. Appellant brought forth evidence to rebut testimony given by Mr. Pieper and submitted his own exhibits. In addition to the expert testimony, the Board heard other evidence to support its adoption of 2010 Regulations: reports from the joint committee formed by the Board and the BOP; testimony from the executive director of the BOP; rulings and warnings from the federal Food and Drug Administration; reports of the dangers of injecting hydrogen peroxide; the stated support of a significant number of practitioners; and testimony from both supporters and opponents of the new formulary, including patients, at its October 2010 hearing. Our task here is not to reweigh the evidence. *See Las Cruces Prof'l Fire Fighters*, 1997-NMCA-044, ¶ 12. We will not substitute our judgment for that of the Board; therefore, we conclude that the Board based its findings and conclusions on substantial evidence and did not act contrary to its statutory authority in approving the 2010 Regulations that are in harmony with the Practice Act.

## 3. The Fees

**{24}** The Board imposed new fees or increased fees for expanded practice certification in four areas under 16.2.10.9(C) NMAC (11/28/10). Specifically, Appellant contends that the following fees are not authorized by the Act:

> (15) application for biennial expanded practice certification renewal: an

8

additional $200;
(16) late expanded practice certification renewal:  an additional $125.00 plus the renewal fee;
(17) expired expanded practice certification renewal:  an additional $100.00 plus the renewal and late fees;
. . . .
(28) administrative fee for application for approval of an expanded practice educational program:  $600.00; [and]
(29) renewal of expanded prescriptive authority course:  $200.00[.]

*Id.*  He argues that the Board is authorized to charge fees only in order to cover administrative expenses and that it may not impose application fees and renewal fees for expanded practice certification.  The Board points out that its powers to impose fees are broad under the Practice Act.  We agree.  Section 61-14A-16 authorizes the Board to:

> establish a schedule of reasonable nonrefundable fees not to exceed the following amounts:
>
> | | | |
> |---|---|---|
> | A. | application for licensing | $800; |
> | B. | application for reciprocal licensing | 750; |
> | C. | application for temporary licensing | 500; |
> | D. | examination, not including the cost of any nationally recognized examination | 700; |
> | E. | annual license renewal | 400; |
> | F. | late license renewal | 200; |
> | G. | expired license renewal | 400; |
> | H. | temporary license renewal | 100; |
> | I. | application for approval or renewal of approval of an educational program | 600; |
> | J. | late renewal of approval of an educational program | 200; |
> | K. | annual continuing education provider registration | 200; |
> | L. | application for extended or expanded prescriptive authority | 500; |
> | M. | application for externship supervisor registration | 500; |
> | N. | application for extern certification | 500; |
> | | and | |
> | O. | any and all fees to cover reasonable and necessary administrative expenses. | |

The Practice Act also directs that the Board shall "establish fees[,]" as well as provide for the examination of applicants for licenses and "provide for the granting and renewal of licenses."  Section 61-14A-9(A), (B), (F).  And under Section 61-14A-8.1(A), that part of the Practice Act's describing expanded practice and prescriptive authority, application fees must be paid before a certification may be issued.  A reading of the Practice Act in its entirety shows that the Board is authorized to establish fees and set rates covering the

9

application for and renewal of licenses.

**{25}** As to Appellant's arguments regarding the fees charged under 16.2.10.9(C)(15) through (17) NMAC, the Practice Act covers annual, late, and expired license renewals. *See* § 61-14A-16(E), (F), (G). We see no material difference between annual or biennial fees in this instance. In addition, the fees charged do not exceed the maximum set forth in the statute. The charges under 16.2.10.9(C)(28) and (29) NMAC are for administrative fees for application for "approval of an expanded practice educational program: $600.00" and "renewal of expanded prescriptive authority course: $200.00[,]" respectively. Both of these fees are authorized under Section 61-14A-16(I), which covers the "application for approval or renewal of approval of an educational program." It should also be noted that the Board did not change the fee for the renewal of the expanded prescriptive authority course; it merely altered the wording of the description of the fee.

**{26}** Appellant further contends that no substantial evidence was provided by the Board to justify the imposition of such fees in its regulations and that there is no mention of them in the statement of reasons. We agree that the Board fails to mention its imposition of fees in its 116-point statement of reasons and its nineteen conclusions of law, but, as noted above, a review of the regulations shows that the Board followed the "boundaries of authority" set out in the statute in establishing fees that are "in harmony with its statutory authority." *Rivas*, 101 N.M. at 593, 686 P.2d at 935. Even so, our review of the record reveals that the Board discussed the reasons for the additional fees at its October 2010 hearing just before voting to implement the fees. As stated by Board member Maddoux:

> I would like to make a comment that the expanded practice is part of the license renewal. And in the statute, it says that the total fee for license renewal cannot exceed $400, I believe. And the additional $100 a year on top of the annual license renewal fee for a [doctor of oriental medicine] does not exceed that amount. And, therefore, does not violate the statute. . . . And the same would apply to the expanded practice, late expanded practice certification renewal, or an expired expanded practice certification. That is part of the license, and [it is] that additional fee that goes with that license renewal.

Board member Maddoux later adds:

> [T]he amount of time spent by the [B]oard and the administrative people in order to get certification and approval for their continuing education, the time that it takes board members on those committees and the administrative staff is greater than those [doctors of medicine] who [do not] have to do the additional seven hours of expanded practice annually, and now [fourteen] hours every two years.

This testimony provided a basis for finding that the added administrative expense "justifies"

10

the added fees. The Practice Act requires that an application fee must be paid before certifications are issued for expanded practice and prescriptive authority, "as determined by rule of the [B]oard." Section 61-14A-8.1(A). Accordingly, if the Board expands or otherwise alters the certification or license renewal process for those involved in expanded practice, the Board is obligated to set fees for those administrative requirements. As the Board explained at its hearing, such certification takes up time of the Board and its staff and brings an added expense. We conclude that the fees added under the challenged regulations, none of which succeed the limits established in the Practice Act, are authorized by the statute and that the Board adequately justified its reasons for implementing the fees.

## 4. Redefinition of "Bioidentical Hormones" and "Natural Substances"

**{27}** Appellant next argues that the Board's redefinition of "bioidentical hormones" and "natural substances" conflicts with the statute and is not supported by substantial evidence in the record. *See* §§ 61-14A-3 and -8.1. The 2010 Regulations define "bioidentical hormones" as "compounds, or salt forms of those compounds, that have exactly the same chemical and molecular structure as hormones that are produced in the human body." 16.2.1.7(B)(9) NMAC (11/28/10). "Natural substances" are defined as "substances that exist in or are produced by nature and have not been substantially transformed in character or use." 16.2.1.7(B)(35) NMAC. These definitions are different than those in the 2005 Regulations. Appellant acknowledges that the Practice Act does not define "bioidentical hormones" nor otherwise restrict the term. *See* § 61-14A-8.1(C)(2)(i). He prefers the definitions contained in the 2005 Regulation. He argues that the Legislature did not change the definition of those terms as listed in the 2005 Regulations when it amended the Practice Act in 2007, suggesting the Legislature approved of the 2005 definitions. Appellant's argument is misplaced. The Legislature does not pass regulations. In fact, as we have explained, the Practice Act gives the power to adopt rules in accordance with the ULA. Section 61-14A-8(B). Under the ULA, the Board is required to "adopt, amend or repeal rules or regulations of general applicability which implement or *interpret* a law enforced or administered by the [B]oard." NMSA 1978, § 61-1-29(A) (1981) (emphasis added). The Board therefore has the authority to interpret a term left undefined in the Practice Act.

**{28}** As to bioidentical hormones, the revised definition was developed by the joint committee of the Board and the BOP. The definition was informed by the Endocrine Society's characterization of such hormones. As to natural substances, the Board was advised by the Attorney General's Office that the previous definition of the term was so broad as to "render[] the term meaningless." The record does contain a rebuttal opinion to that of the Attorney General's Office, but even that opinion notes that a valid definition of "natural substances" would include those natural substances that have not undergone changes to their molecular structure. We conclude that the Board had the statutory authority to define the two substances and the definitions in the 2010 Regulations were based on substantial evidence.

## 5. Willful, Arbitrary, or Capricious

11

**{29}** Finally, Appellant briefly argues that the regulations resulted from willful conduct by a biased Board determined to flout its statutory authority. The Board contends that it spent several years conducting the rulemaking process and considering exhibits and testimony from both sides of the argument. The Board asserts that the adoption of regulations ended a long-running impasse and included extensive input from Appellant, who is the former head of the Board.

**{30}** An administrative board acts in an arbitrary and capricious manner "when its action is unreasonable, irrational, wilful, and does not result from a sifting process." *Oil Transp. Co. v. N.M. State Corp. Comm'n*, 110 N.M. 568, 572, 798 P.2d 169, 173 (1990). Here, the Board sifted through testimony and exhibits and weighed evidence compiled over the course of about three years. We find no conflict with the Board's statutory authority and nothing in the record to support the conclusion that the Board's actions were "wilful and unreasonable, without consideration, and in disregard of the facts and circumstances." *In re PNM Elec.*, 1998-NMSC-017, ¶ 24. In sum, we conclude that the Board acted properly in adopting the regulations in October 2010.

## III.    CONCLUSION

**{31}** For the foregoing reasons, we reverse the Board's decision to impose the emergency regulations, and we affirm the Board's approval of the permanent regulations.

**{32}    IT IS SO ORDERED.**

 

                               _____

                               **CELIA FOY CASTILLO, Chief Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Judge**

_____

**LINDA M. VANZI, Judge**

**Topic Index for *Wilcox v. N.M. Bd. of Acupuncture & Oriental Med*, Nos. 30,500/30,869**

**ADMINISTRATIVE LAW AND PROCEDURE**
Arbitrary and Capricious Actions
Rules
Standard of Review
Sufficiency of Evidence

**APPEAL AND ERROR**

Standard of Review
Substantial or Sufficient Evidence

**GOVERNMENT**
Licensing