# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: June 7, 2018_____

**NO.  A-1-CA-35149**

**THE COUNSELING CENTER, INC.,**

>      Respondent-Appellant,

v.

**NEW MEXICO HUMAN SERVICES DEPARTMENT,**

>      Petitioner-Appellee.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Francis J. Mathew, District Judge**

Davis & Gilchrist, P.C.
Bryan J. Davis
Albuquerque, NM

for Respondent

New Mexico Human Services Department
Christopher P. Collins, General Counsel
John R. Emery, Deputy General Counsel
Santa Fe, NM

for Petitioner

**OPINION**

**VARGAS, Judge.**

{1}    The New Mexico Human Services Department (HSD) appeals the district court's reversal of an administrative decision requiring The Counseling Center, Inc. (TCC), a behavioral health care provider, to reimburse HSD for claimed overpayments. HSD makes two arguments on appeal. First, HSD argues that the district court erred when it overturned the administrative law judge's conclusion that TCC failed to satisfy its burden of proof because it did not audit one hundred percent of the claims at issue. Second, HSD contends that the district court erroneously concluded that the administrative law judge's decision requiring TCC to return fees mistakenly paid with Medicaid funds to HSD is not supported by substantial evidence. Because the administrative law judge did not properly apply the regulations governing the recovery of overpayments, we affirm the district court's decision regarding TCC's burden of proof, though for reasons other than those stated by the district court. Further, because substantial evidence supports the administrative law judge's finding that TCC was erroneously paid with Medicaid funds and federal law requires that a provider who receives an overpayment of such funds must return them, we reverse the district court on that issue. The case must be remanded to the administrative law judge for further proceedings in accordance with our decision.

**BACKGROUND**

{2}	In 1977 the Legislature created the Human Services Department, organized in six different divisions, including the medical assistance division (MAD). *See* NMSA 1978, § 9-8-2 (1977); NMSA 1978, § 9-8-4(A)(3) (2007). The Human Services Department Act requires HSD to contract for behavioral health treatment and support services for New Mexicans. *See* NMSA 1978, § 9-8-7.1(A) (2007). In 2009 OptumHealth New Mexico, Inc. (OptumHealth), a managed care organization, was awarded the statewide contract to manage and oversee the administration of these behavioral health services. *See* 8.311.2.11(C) NMAC; NMSA 1978, § 9-7-6.4(A), (B)(5) (2008) (creating a "collaborative," comprised of secretaries from various commissions and departments and chaired by the secretary of HSD, and authorizing the collaborative to "contract for operation of one or more behavioral health entities to ensure availability of services throughout the state"). OptumHealth, in turn, contracted with statewide behavioral health care providers to provide behavioral health services, with providers agreeing to provide services at a mutually-agreed upon amount, or at a reimbursement rate defined by the Medicaid rate for services rendered. *See* 8.311.2.11(C) NMAC.

{3}	TCC, a behavioral health care provider in Alamogordo, New Mexico was among the providers to contract with OptumHealth. As part of its contract with

OptumHealth, TCC provided behavioral health services for the state's Medicaid clients, as well as for clients of the Children, Youth and Families Department (CYFD) and HSD's Behavioral Health Services Division (BHSD).

{4} Between July 1, 2009 and January 2011, OptumHealth struggled to implement its new billing system to manage the administration of behavioral health services in New Mexico. During that time period, TCC received thirty-one reimbursement fee schedules from OptumHealth. The reimbursement fee schedules TCC received from OptumHealth listed the services TCC was allowed to provide and the reimbursement rate for those services. The fee schedules were sometimes back-dated and contained several mistakes, including missing service codes, missing modifiers, incorrect rates and incorrect units, requiring that they be revised and reissued on numerous occasions.

{5} In November 2012 OptumHealth asked to meet with HSD leadership to present information regarding suspicious activities of several health care providers referred to as the Rio Grande providers, including TCC. OptumHealth's presentation suggested aberrant billing patterns in the billings of the Rio Grande providers. After hearing OptumHealth's presentation, HSD hired Public Consulting Group (PCG) to audit the Rio Grande providers.

{6} On June 21, 2013, HSD leadership met with PCG and received its report. When

PCG presented its report to HSD, it had not yet had the opportunity to follow up with providers to request additional documentation. Instead, PCG was advised to do no further work, as HSD had decided to refer TCC and fourteen other providers to the Medicaid Fraud Control Unit (MFCU) of the Attorney General's Office for further investigation. At the time it was directed to stop work, PCG had identified twenty-six claims out of a 150 claim sample group that failed in a random sample audit of TCC claims (PCG audit). That number was later reduced to nine when the Attorney General requested and received additional documentation from TCC.

{7} When the audit of TCC was referred to the Attorney General's Office, TCC was advised by HSD that all payments on state contracts, whether for Medicaid or non-Medicaid services, were immediately suspended.

{8} The Attorney General's Office conducted its investigation and issued its report on January 10, 2014. The Attorney General's investigation reviewed the PCG audit, the OptumHealth audit and a referral that came into its office regarding TCC. The Attorney General reported that the nine failed claims out of 150 randomly sampled claims from the PCG audit resulted in overcharges totaling $5,264.24. The Attorney General was able to resolve the concerns raised in the OptumHealth audit as part of its investigation, and did not identify any inappropriate charges resulting from that audit.

{9} Finally, the Attorney General investigated the allegations set out in an anonymous letter sent to its office in 2012, alleging that TCC employees had been ordered to bill more time than was actually spent with clients, including Medicaid clients, to destroy progress notes and assessments and treatment plans, and to sign progress notes even though they had seen Medicaid clients for less than one hour. The Attorney General's Office was unable to substantiate the claims set out in the anonymous letter by talking to current and former employees; however, one former manager advised that TCC had been doing basic mental health assessments of clients and billing them as enhanced assessments. Investigators from the Attorney General's Office met with the entire TCC staff and TCC attorneys in August 2013. The investigators reported that "[a]ll of the staff believe that they are appropriately preparing assessments and were surprised to learn that the assessments reviewed by our office did not qualify as enhanced." TCC staff denied ever hearing any discussions about billing for enhanced assessments while only performing basic assessments.

{10} Prior to meeting with TCC, the Attorney General's Office performed an audit of a random sample of thirty clients for whom TCC had submitted bills for behavioral health services identified with an H0031 billing code between January 2010 and March 20, 2013 (Attorney General's audit). The H0031 billing code is used to bill for

several different types of behavioral health services to several different government agencies, with billing to an agency defined by whether a modifier is used or not. The H0031 billing code with no modifier indicated a billing to the BHSD. An H0031 billing code containing an HA modifier indicated an assessment of a minor billed to CYFD or BHSD. Finally, claims submitted with the H0031 U8 code and modifier denoted billing for services provided to adult Medicaid clients under the psychosocial rehabilitation umbrella of services.

{11}     At the conclusion of the Attorney General's investigation, on February 20, 2014, HSD requested that TCC remit $343,000.49 to satisfy overpayments, including extrapolated overpayments calculated from the results of the Attorney General's audit and the PCG audit. TCC timely filed a request for fair hearing pursuant to 8.352.3.9 NMAC. An administrative law judge (ALJ) held a four-day hearing to address the validity of the methodology employed in extrapolating the overpayments made to TCC, whether TCC improperly billed certain claims using the incorrect modifier, and whether TCC was paid out of Medicaid funds for those claims.

{12}     At the hearing, TCC challenged the failure of each of the nine claims found to have failed by the PCG audit. TCC also challenged the failure of the claims that were the subject of the Attorney General's audit. The evidence showed that TCC submitted thirty-nine claims related to thirty different clients using the H0031 billing code, both

6

with and without modifiers, with some clients receiving multiple assessments. At the hearing, the parties stipulated that four of the claims submitted did not meet the criteria to be billed as H0031 U8 claims. Of the remaining claims, TCC presented evidence to the ALJ that nine of those claims should not have failed because TCC had not billed them to Medicaid, though they were erroneously paid with Medicaid funds. TCC also challenged the remaining failed claims in the Attorney General's audit, presenting evidence as to why each claim properly fell within the scope of the H0031 U8 billing code used when the claim was submitted.

{13}    At the conclusion of the hearing, HSD requested that the ALJ direct TCC to return overpayments totaling $379,135.26, representing the extrapolated overpayments from the PCG audit and the Attorney General's audit, including claims properly billed by TCC, but erroneously paid from Medicaid funds.

{14}    After hearing the evidence and arguments of the parties, the ALJ made findings of fact. Among the findings made by the ALJ were findings that:

1.    There were 706 claims submitted to and paid by OptumHealth to TCC under code H0031 with the modifier of U8 for the time period that is at issue. A random sample of 30 claims, all of which had been determined to have failed, was applied to this universe of 706 claims using a ratio-based analysis for extrapolation. This resulted in an overpayment claim of $285,468.91. . . .

2.    The Attorney General's office reviewed the audit results from the Public Consulting Group (PCG) regarding the 150 claims that had been randomly sampled by PCG. The Attorney General's office determined that nine claims failed. When the nine claims were extrapolated by PCG, that resulted in an overpayment claim of $62,837.00. . . .

. . . .

18.    OptumHealth would use incorrect funding sources with respect to payment for TCC's billings, which thereafter would require corrections to be made. . . .

{15}    Using its findings, the ALJ reached the following four conclusions:

**1.    Attorney General's Audit of H0031 (U8) Claims and Extrapolated Results**

{16}    The ALJ concluded that the $285,468.91 in overpayments claimed by HSD resulting from the Attorney General's audit constituted prima facie evidence of the overpayment. To rebut this prima facie showing, the ALJ concluded, TCC was therefore "required to take certain steps, as the 'burden of proof of compliance' shifted to it" under 8.351.2.13(A) NMAC. Though the ALJ acknowledged that "TCC did put forward a certain amount of credible evidence in opposition, it failed to provide . . . the requisite '[one-hundred] percent audit of the universe of provider records' in support of its position." As a result, the ALJ found HSD was entitled to recover these monies.

## 2. PCG Audit and Extrapolated Results

{17} Next, the ALJ applied the same rationale to the extrapolated overpayment resulting from the nine failed claims set out in the PCG audit, concluding that because TCC did not rebut HSD's prima facie case with a one-hundred percent audit of the more than 78,000 claims, HSD was entitled to recover its extrapolated overpayment in the amount of $62,837.00.

## 3. H0031 Claims (No Modifier) Paid With Medicaid Funds

{18} The ALJ concluded that "the evidence establishes that TCC did not bill [H0031 (no modifier)] claims to Medicaid" but that "the evidence establishes that TCC was credited with an amount of $25,210.77 in Medicaid funds, in connection with there having been numerous problems associated with the payor's (OptumHealth) interactions with TCC and its processing of TCC's claims." In reaching this conclusion and finding in favor of HSD on the issue, the ALJ "afforded substantial weight" to the testimony of Robert Stevens.

## 4. H0031 (HA) Claims Paid With Medicaid Funds

{19} Finally, the ALJ applied the same logic to HSD's H0031 (HA) claims as it applied to the H0031 claims without a modifier, finding that TCC had been credited with the $5,618.58 in billings under code H0031 (HA). As such, the ALJ concluded that HSD should prevail on that portion of its claim.

9

{20}     In light of these four conclusions, the ALJ determined that "the weight of the evidence goes in favor of HSD" and recommended that the MAD director of HSD "uphold the overpayment in the total amount of $379,135.26." HSD adopted the ALJ's recommendations, and TCC appealed the issue to the district court pursuant to Rule 1-074 NMRA.

{21}     The district court determined that the ALJ's conclusions regarding the extrapolated Attorney General audit claims and the extrapolated PCG audit claims were not decided in accordance with the law. The district court then determined that conclusions regarding the Medicaid payments of the H0031 (no modifier) claims and H0031 (HA) claims were "not supported by substantial evidence[,]" focusing on the limitations of and weaknesses in the testimony of HSD's employee Robert Stevens. As a result, the district court reversed the HSD decision adopting the ALJ's recommendation. It remanded the ALJ's conclusions regarding the extrapolated Attorney General audit and PCG audit claims for further proceedings, instructing the agency to apply the preponderance of the evidence burden stated in 8.352.3.12(D) NMAC. The district court also ordered that "[a]ny monies withheld with respect to [H0031 (no modifier) claims and H0031 (HA) claims] shall be paid to [TCC.]" HSD filed a petition for writ of certiorari seeking review of the decision, which we granted.

**STANDARD OF REVIEW**

{22} We review HSD's decision to determine whether it acted fraudulently, arbitrarily or capriciously, whether its decision was not supported by substantial evidence, or whether it failed to act in accordance with law. *See* NMSA § 39-3-1.1(D) (1999); *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806. "A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *Rio Grande Chapter of the Sierra Club*, 2003-NMSC-005, ¶ 17. In reviewing agency decisions, we remain mindful that "in resolving ambiguities in the statute or regulations which an agency is charged with administering, the Court generally will defer to the agency's interpretation if it implicates agency expertise." *Atlixco Coal. v. Maggiore*, 1998-NMCA-134, ¶ 30, 125 N.M. 786, 965 P.2d 370. However, in considering whether HSD's actions were in accordance with the law, we note that interpretation of a statute or regulation is a matter of law that this Court reviews de novo; and, we are not bound by HSD's or the district court's interpretation of the relevant statutes and regulations. *N.M. Mining Ass'n v. N.M. Water Quality Control Comm'n*, 2007-NMCA-010, ¶ 11, 141 N.M. 41, 150 P.3d 991 (citing *Rio Grande Chapter of the Sierra Club*, 2003-NMSC-005, ¶ 17).

**DISCUSSION**

{23}   HSD's arguments on appeal can be distilled to two issues. First, HSD contends that the district court erred when it overturned the ALJ's conclusions that TCC failed to satisfy its burden of proof when it did not provide a one-hundred percent audit of the universe of provider records to challenge the Attorney General's audit and PCG audit. Second, HSD argues that the district court erred when it held that HSD's decision requiring TCC to return payments erroneously paid with Medicaid funds was not supported by substantial evidence.

**A.    One-Hundred Percent Audit Requirement**

{24}   To determine whether the ALJ applied the proper burdens of proof to the parties at the fair hearing, we first consider the regulatory scheme applicable to HSD-funded medical assistance programs, including the burdens of the parties in proceedings to recover overpayments and the circumstances under which a one-hundred percent audit of the claims universe is required. Next, we consider whether the ALJ properly applied the regulations. Finding he did not, we affirm the district court, though on grounds different than those stated in its decision. *See Lynn Hawkins v. McDonald's*, 2014-NMCA-048, ¶ 23, 323 P.3d 932 ("Under the right for any reason doctrine, we may affirm the district court's order on grounds not relied upon by the district court if those grounds do not require us to look beyond the factual

allegations that were raised and considered below." (internal quotation marks and citation omitted)); *State v. Vargas*, 2008-NMSC-019, ¶ 8, 143 N.M. 692, 181 P.3d 684 (stating that we may affirm the district court on grounds not relied upon if those grounds do not require us to look beyond the factual allegations raised and considered below).

**HSD Regulations**

{25}    Overpayments are defined as "amounts paid to a MAD provider or other entity in excess of the MAD allowable amount" and include "payment for any claim for which the provider or other entity was not entitled to payment because an applicable MAD NMAC rule and its requirements were not followed." 8.351.2.13 NMAC. In furtherance of recovering overpayments, HSD has promulgated regulations that include procedures for auditing a provider's records to determine whether the provider has been overpaid for its services. *See* 8.351.2.13(A) NMAC (setting out audit procedures for recovery of overpayments). First, the overpayment regulations note that "[t]he audit findings generated through the audit procedure shall constitute prima facie evidence in all MAD proceedings of the number and amount of requests for payment as submitted by the provider[.]" 8.351.2.13(A)(1) NMAC. Because of the voluminous number of claims submitted by providers, the regulations permit MAD to employ statistical sampling and extrapolation techniques to derive the total

overpayment a provider may have received. The regulation governing the recovery of overpayments provides:

> MAD's procedures for auditing a provider or other entity may include the use of random sampling and extrapolation. When this procedure is used, all sampling will be performed using generally accepted statistical methods and will yield statistically significant results at a confidence level of at least 90 percent. Findings of the sample will be extrapolated to the universe for the audit period.

8.351.2.13(A)(2) NMAC.

{26} The provider has the burden of proof of any noncompliance with statistical sampling techniques in the event of any disagreement with MAD's audit findings arising from an audit utilizing sampling and extrapolation methodology. *See* 8.351.2.13(A)(3) NMAC.

{27} The provider or other entity may present evidence to show that the sample was invalid; however, the evidence supporting such invalidity must include a one-hundred percent audit of the universe of provider records used by MAD in the drawing of its sample. 8.351.2.13(A)(3) NMAC. Any one-hundred percent audit must:

> (a)     be arranged and paid for by the provider or other entity;

> (b)     be conducted by a certified public accountant;

> (c)     demonstrate that a statistically significantly higher number of claims and records not reviewed in MAD sample were in compliance with MAD NMAC rules, and

(d)     be submitted to MAD with all supporting documentation. 8.351.2.13(A)(3) NMAC.

{28}     A provider may request an administrative hearing if it disagrees with a decision of MAD with respect to recovery of overpayments resulting from incorrect billing, lack of documentation to support the medical necessity of a service, claims that the service was provided, or the imposition of a sanction or other remedy. *See* 8.352.3.10(C)(1)(c) NMAC. At the administrative hearing, "MAD has the burden of proving the basis to support its proposed action by a preponderance of the evidence." 8.352.3.12(D) NMAC.

**Extrapolated Overpayment Claims**

{29}     At the hearing before the ALJ, TCC challenged both the statistical sampling techniques used by HSD, as well as HSD's claims that several of TCC's claims failed to satisfy the criteria for the payment sought. On appeal to the district court, however, TCC's appeal was limited to the issues related to its failed claims. During the fair hearing, TCC challenged the failure of all but four of the claims used in the Attorney General's audit and PCG audit to extrapolate the alleged overpayment. HSD admits that it has the burden to show that the cases randomly selected for audit failed when it employs statistical sampling and extrapolation techniques to determine an overpayment. Once HSD has shown that the case failed, HSD contends, then the

15

burden shifts to the provider to show that the claim actually did not fail. If the provider shows the claim should not have failed, then the extrapolated overpayment is adjusted to reflect the fact that fewer claims failed than were initially noted. HSD concedes that, even after it has established that the claims failed, it still has the burden to mathematically prove the extrapolation and overpayment amount. Upon proof of the extrapolation and overpayment amount, the burden shifts to the provider, who is then obligated to produce evidence. HSD explains that, only if a provider disagrees with the math—the manner in which the extrapolation was calculated and not just the findings of failed claims—must the provider conduct a one-hundred percent audit of the claims universe. While we agree with HSD's interpretation of the burdens of the parties under the regulations, we do not agree that this is how those burdens were applied by the ALJ to this case.

{30} At oral argument, HSD contended that the ALJ found that all of the claims challenged by TCC at the fair hearing failed, pointing to the ALJ's findings 1 and 2 as support for its argument. Therefore, HSD asserted, those claims were properly included in its extrapolation. We do not interpret the ALJ's findings to support HSD's position. Rather than making a finding that MAD had properly determined that the claims failed, we interpret the ALJ's findings as merely reporting the conclusions reached by MAD and the Attorney General's office, rather than making a

determination that he agreed with those conclusions. Referring to the Attorney General's audit, finding number 1 reports on "[a] random sample of 30 claims, all of which *had been determined to have failed*," while finding no. 2 states that upon review of the PCG audit, "[t]he *Attorney General's office determined* that nine claims failed." (Emphases added.) Nowhere in his findings does the ALJ indicate that he agreed with the Attorney General's office or MFCU, or that he had otherwise determined that the claims failed. Instead, the ALJ's findings and conclusions indicate that he merely reported the outcomes of the audits as determined by MFCU and the Attorney General's office, note that "TCC did put forward a certain amount of credible evidence[,]" but then fail to consider any of that evidence or reach any of his own conclusions regarding the validity of those alleged failed claims because TCC had not performed a one-hundred percent audit of the universe of provider records. The district court correctly found that the ALJ improperly shifted the burden of proof to TCC, as TCC was not required to provide a one-hundred percent audit of the universe of providers before the ALJ could properly consider whether the claims used to extrapolate TCC's alleged overpayment actually failed.

{31} As part of our review of the district court's decision, we note that the district court concluded that "[t]o require TCC to engage and complete a one-hundred percent audit for the purpose of pursuing its rights at a hearing is unreasonable, especially

17

considering the reasonable time necessary . . . to meet the audit requirements of 8.351.2.13 [NMAC] and in light of 8.352.3.12(A) [NMAC], which does not mention such a requirement." To the extent that this issue may arise on remand, we take the opportunity to address it now. While we agree that TCC was not required to perform a one-hundred percent audit of the universe under the circumstances of this appeal, we disagree with the district court's broad conclusion that the regulation requiring a one-hundred percent audit is unreasonable.

**A One-Hundred Percent Audit is Reasonable**

{32}    "Rules and regulations enacted by an agency are presumed valid and will be upheld if reasonably consistent with the statutes that they implement." *Earthworks' Oil & Gas Accountability Project v. N.M. Oil Conservation Comm'n*, 2016-NMCA-055, ¶ 11, 374 P.3d 710 (internal quotation marks and citation omitted). Because its rule-making function involves the exercise of discretion, we defer to the agency when reviewing its rule-making decisions. *See id.* We will not substitute our judgment for that of the agency where there is no showing of an abuse of discretion. *See Wilcox v. N.M. Bd. of Acupuncture & Oriental Med.*, 2012-NMCA-106, ¶ 7, 288 P.3d 902. To successfully challenge the validity of a rule adopted by an administrative agency, the party challenging the rule has the "burden of showing that the rule is arbitrary or capricious by demonstrating that the rule's requirements are not reasonably related

18

to the legislative purpose." *Earthworks' Oil & Gas Accountability Project*, 2016-NMCA-055, ¶ 11 (alteration, internal quotation marks, and citation omitted).

{33}     As set out above, the requirement for a one-hundred percent audit becomes relevant only if a provider claims that the sample used to calculate the overpayment was invalid. *See* 8.351.2.13(A)(3) NMAC. It does not apply to circumstances where the issue is whether a particular claim was properly passed or failed during the course of the audit or whether the mathematical calculation of the extrapolated overpayment was accurate. Instead, should a provider wish to challenge the methodology used to choose the sample size of the audit or to randomly select the claims for audit, the regulation requires that, rather than merely choose a different sample size, or select a different set of claims for audit, the provider must audit the entire universe of claims at issue. *See id. But see Chaves Cty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 921 (D.C. Cir. 1991) (holding that under federal law, a provider may challenge accuracy of an extrapolation by separately presenting evidence of a different random sample from the universe of claims or establish the validity of all or a sufficient number of claims to demonstrate that the extrapolation is factually impossible of correctness); N.C. Gen. Stat. Ann. § 108C-5(n)(2) (West 2014) (stating that a provider may challenge error rate of extrapolated audit results by *either* conducting a one-hundred percent file review *or* conducting a second audit upon a sample chosen

by the [d]epartment); 42 C.F.R. § 402.109(c) (2012) (providing that once the agency "has made a prima facie case, the burden is on the respondent to produce evidence reasonably calculated to rebut the findings of the statistical sampling study").

{34} Initially, we note that the ALJ does not appear to have made any findings or conclusions regarding the validity of the audit samples used to extrapolate the overpayment claimed by HSD based on the Attorney General's audit and the PCG audit. While our courts have not previously addressed the propriety of the requirement that a party challenging the validity of an audit sample show that the sample was invalid by auditing one hundred percent of the universe of provider records, the parties point us to the Seventh Circuit's decision in *Illinois Physicians Union v. Miller*, 675 F.2d 151 (7th Cir. 1982). The *Illinois Physicians Union* court considered "whether the state, in attempting to preserve its welfare monies, may place the burden on the physician to demonstrate that the [d]epartment's calculations are inaccurate." *Id.* at 154. Finding "nothing improper with the [d]epartment's requirement that the physician, not the [d]epartment, conduct the one[-]hundred percent audit[,]" *id.* at 158, the court held that it was not arbitrary or capricious to require providers who are benefitting from publicly funded welfare programs to bear the burden of conducting a one-hundred percent audit, "particularly when the state has already borne the cost of the initial audit and the evidence to rebut that initial

determination is uniquely within the [provider's] control." *Id.*

{35}	In this instance, we cannot conclude that the requirement that a provider who challenges the validity of a sample conduct a one-hundred percent audit of the claims universe is not reasonably related to the legislative purpose. *See Earthworks' Oil & Gas Accountability Project,* 2016-NMCA-055, ¶ 11 (stating that to invalidate an administrative rule, the party challenging the rule has the burden of showing that the rule's requirements are not reasonably related to the legislative purpose). States that elect to participate in the Medicaid program are entitled to receive federal funds so long as they "comply with requirements imposed by the [Social Security] Act and by the Secretary of Health and Human Services." *Atkins v. Rivera*, 477 U.S. 154, 157 (1986). The one-hundred percent audit requirement is reasonably related to HSD's compliance responsibilities, including its responsibility to recover overpayments made to Medicaid providers, and is therefore not arbitrary or capricious or an abuse of the agency's discretion. As such, should the validity of the sample be an issue on remand, the rule is not unreasonable or invalid.

**HSD's Obligation and Burden of Proof**

{36}	Finally, notwithstanding the regulation's requirement that evidence of the invalidity of MAD's sample must include a one-hundred percent audit of the universe, a provider's failure to perform such an audit does not relieve HSD of its

21

obligation to prove the basis to support its claim for overpayment by a preponderance of the evidence at the fair hearing, including proof that its sample was valid. *See* 8.352.3.12 NMAC. In this case, the ALJ concluded that the calculated overpayment resulting from the sampling and extrapolation of the Attorney General's audit and the PCG audit constitute "[p]rima facie evidence. . . of the number and amount of requests for payment as submitted by the provider or other entity." 8.351.2.13(A)(1) NMAC. We note that the ALJ appears to conflate the amount of the overpayment calculated as a result of the Attorney General's and PCG's audits with the "number [of requests] and amount of requests for payment as submitted by the provider[.]" *See id.* Regulation 8.351.2.13(A)(1) NMAC states nothing more than the fact that the information set out in the audit findings constitutes prima facie evidence of the "requests for payment as submitted by the provider," and makes no reference to or assumptions about the validity of those claims or any determination of overpayment by HSD. While the ALJ appears to have decided that the audit findings were prima facie evidence of the overpayment, shifting the "burden of proof of compliance" to TCC, the regulations do not support this conclusion. Not only must HSD prove by a preponderance of the evidence at the fair hearing that the identified claims failed, but also that its mathematical calculations of the overpayment were properly calculated and the methodology it used to choose the sample was valid. Should a provider

challenge the validity of the sample, but fail to perform a one-hundred percent audit of the claims universe, HSD is not relieved of its obligation to prove its validity by a preponderance of the evidence. It simply has the opportunity to do so with little resistance from the provider—with regard to the methodology used to choose the sample. Should the ALJ determine that HSD's methodology in choosing its sample was unreliable, notwithstanding the provider's failure to perform a one-hundred percent audit, the ALJ could properly find that HSD failed to satisfy its burden by proving by the greater weight of the evidence that its sample is valid. *See Campbell v. Campbell*, 1957-NMSC-001, ¶ 24, 62 N.M. 330, 310 P.2d 266 (stating that "[p]reponderance of the evidence simply means the greater weight of the evidence").

{37}     Because we affirm the district court's decision regarding the burden of proof, the district court shall remand this case back to the ALJ to make findings, applying the preponderance of the evidence standard, related to the failed claims challenged by TCC, related to any necessary adjustments to the total overpayment amount claimed by HSD based on its extrapolation, and related to the validity of the sample sizes used in the Attorney General's audit and the PCG audit.

**B.     Payment of Claims From Medicaid Funds**

{38}     Finally, we address HSD's claims that the district court erred when it concluded that the ALJ's decision requiring TCC to return fees mistakenly paid with

Medicaid funds to HSD is not supported by substantial evidence. The ALJ concluded that TCC was credited with Medicaid funds in the amount of $25,210.77 for H0031 (no modifier) claims and $5,618.58 for H0031 HA claims, notwithstanding that "TCC did not bill these claims to Medicaid." Finding the testimony of HSD's witness, Robert Stevens, to be lacking, the district court held that the ALJ's conclusion that TCC was credited with Medicaid funds was not supported by substantial evidence. We disagree.

{39} On appeal, we review the whole record in the light most favorable to the ALJ's decision to determine whether substantial evidence supports that decision. *See Duke City Lumber Co. v. N.M. Envtl. Improvement Bd.*, 1984-NMSC-042, ¶¶ 13-14, 101 N.M. 291, 681 P.2d 717. "To conclude that an administrative decision is supported by substantial evidence in the whole record, the court must be satisfied that the evidence demonstrates the reasonableness of the decision. No part of the evidence may be exclusively relied upon if it would be unreasonable to do so. The reviewing court needs to find evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency." *Nat'l Council on Comp. Ins. v. N.M. Corp. Comm'n*, 1988-NMSC-036, ¶ 8, 107 N.M. 278, 756 P.2d 558.

{40} The ALJ concluded that TCC did not bill H0031 (no modifier) and H0031 HA claims to Medicaid, but that TCC was nonetheless paid with Medicaid funds for some of those claims as a result of numerous problems associated with the manner in which OptumHealth processed the claims. Of note is the fact that, while the district court found a lack of substantial evidence to support the ALJ's finding that TCC was erroneously paid from Medicaid funds, on appeal, TCC concedes that though TCC properly submitted its claims, OptumHealth, without TCC's knowledge, "frequently paid these claims using Medicaid funds." The ALJ's finding and TCC's admission about the source of payment for H0031 (no modifier) and H0031 HA claims are supported by substantial evidence in the administrative record. Robert Stevens, the bureau chief of the Program Policy and Integrity Bureau of MAD, testified that he oversees the claims processing system for the State. Mr. Stevens testified about records produced from MAD's data warehouse showing claims submitted by OptumHealth. Included among those records were records showing TCC H0031 (no modifier) and H0031 HA claims paid by OptumHealth. MAD, he explained, receives an "encounter claim" from OptumHealth, with OptumHealth retaining the information it received from the provider. OptumHealth adds information to the encounter claim, such as the amount OptumHealth paid on the claim, as well as the date it paid the claim to the provider before submitting it to MAD. Mr. Stevens testified that the

25

records maintained by MAD for the H0031 (no modifier) and H0031 HA claims showed that payment was erroneously paid to OptumHealth from Medicaid funds. Based on Mr. Stevens' testimony, the ALJ concluded that TCC was paid with Medicaid funds for services that were not eligible for payment by Medicaid.

{41}    "[W]e will not reweigh the evidence nor substitute our judgment for that of the fact[-]finder." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177. "To conclude that substantial evidence exists to support an administrative decision we need only find that there is credible evidence for a reasonable mind to accept as adequate the result reached by the agency." *Id.* We conclude that substantial evidence exists to support the ALJ's finding that the H0031 (no modifier) and H0031HA claims at issue were paid with Medicaid funds.

{42}    TCC argues that the district court properly concluded that it was not required to reimburse HSD for these payments because, as the ALJ found, TCC did not bill those claims to Medicaid. Instead, TCC claims HSD must address any issues related to erroneous payments to OptumHealth. HSD does not contend that TCC was not entitled to payment for the H0031 (no modifier) and H0031 HA claims, arguing only that it was not entitled to payment from Medicaid funds.

{43}    In considering TCC's argument, we note that federal law governing Medicaid payments requires that one who receives an overpayment shall "report and return the

26

overpayment to the Secretary, the State, an intermediary, a carrier, or a contractor, as appropriate[.]" 42 U.S.C. §1320a-7k(d)(1)(A) (2012). Notwithstanding that TCC properly billed the H0031 (no modifier) and H0031 HA claims, federal law requires that overpayments of Medicaid funds must be returned. As none of the claims at issue were entitled to be paid from Medicaid funds, they must be returned to the State. We reverse the district court on this issue.

**CONCLUSION**

{44}     The decision of the district court is reversed as to the H0031 (no modifier) and H0031 HA claims erroneously paid from Medicaid funds. The district court is affirmed on the remaining issues on appeal, and the district court is instructed to remand this matter to the ALJ to make findings, applying the preponderance of the evidence standard related to the failed claims challenged by TCC, related to any necessary adjustments to the total overpayment amount claimed by HSD based on its extrapolation, and related to the validity of the sample sizes used in the Attorney General's and the PCG audits.

{45}     **IT IS SO ORDERED.**

_____
**JULIE J. VARGAS, Judge**

27

**WE CONCUR:**

_____

**M. MONICA ZAMORA, Judge**

_____

**STEPHEN G. FRENCH, Judge**